**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**HUNTINGTON DIVISION**

**GARY W. CASDORPH, and**
**DIANA L. CASDORPH,**

**Plaintiffs,**

**v.** **CIVIL ACTION NO.** 3:25-cv-00213

**VANDERBILT MORTGAGE & FINANCE, INC.,**
**and CMH HOMES, INC. d/b/a**
**CLAYTON HOMES OF BARBOURSVILLE,**

**Defendants.**

# COMPLAINT

## INTRODUCTION

1. This case arises out of the deceptive origination and closing of an exploitive mobile home financing. Plaintiffs were induced into putting up their existing home and 3.6 acres of land to finance the purchase of a singlewide mobile home by deception and suppression, without being afforded a meaningful opportunity to understand the exploitive terms of the "sticker shocking" transaction.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction in that this action presents a federal question, 28 U.S.C. § 1331, and specifically under 15 U.S.C. section 1640(e). The contract was entered into at the Clayton Homes lot of CMH Homes Inc, 5898 Route 60 East, Barboursville, Cabell County, West Virginia 25504.

## PARTIES

3. Plaintiffs Gary W. Casdorph and Diana L. Casdorph are a married couple residing in West Virginia. Mr. and Mrs. Casdorph are very unsophisticated in mortgage financing. Plaintiff Gary Casdorph is handicapped and reads at only a kindergarten level.

4. Lender: Defendant Vanderbilt Mortgage & Finance, Inc. ("Vanderbilt" or "VMF") is a corporation licensed to do business in West Virginia with its principal place of business at 500 Alcoa Trail, Maryville, TN 37804. Defendant is a subsidiary of Clayton Homes, Inc., which is, in turn, a subsidiary of Berkshire Hathaway, Inc. Defendant Vanderbilt is an affiliate of CMH Homes, Inc., and liable for all claims and defenses arising out of the transaction, including those arising out of the act of its agents and transaction participants.

5. Said Defendant is a "creditor" under TILA and Regulation Z, because Defendant regularly extends credit—specifically, mortgage loans—to consumers for personal, family, or household purposes, where the credit is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and where the obligation is initially payable to Defendant. 12 C.F.R. § 1026.2(12), (17), implementing 15 U.S.C. § 1602(g), (i).

6. Seller: Defendant CMH Homes, Inc. d/b/a Clayton Homes Barboursville ("CMH" or "Clayton") with a principal place of business at 5000 Clayton Road, Maryville, TN 37804, is a West Virginia licensed dealer, which has a retail place of business at 5898 Route 60 East, Barboursville. WV. It is an affiliate of Vanderbilt.

7. Closing Agent: First Title Agency, Inc. ("First Title") is licensed to do business in West Virginia with its principal place of business at Westerville, Ohio.

## STATEMENT OF FACTS

**Agreement to Purchase at Reduced Price**

8. In or about May 20, 2023, Plaintiffs pursued the purchase of a new mobile home from Defendant Seller Clayton. Plaintiffs visited the lot of said Seller in Barboursville and had preliminary discussion with sales agent Brandon Maynard who directed them to The Cool Breeze model, which was on the clearance board at $99,900. Plaintiffs were not informed that it was a model from a prior year.

9. The said Seller Defendant recommended and arranged financing through Defendant Vanderbilt, its affiliated lender. On May 20, 2023, Maynard arranged for the electronic submission of a credit application to Vanderbilt. The reduced price purchase called for a $1000 deposit.

10. Plaintiffs soon thereafter on May 27, 2023, presented to Brandon Maynard, CMH's Facebook offer on The Cool Breeze home for the reduced price of $97,500, and Maynard said they could have it for that price. The Ad stated: "COOL BREEZE NOW $97,500 . . . All furniture INCLUDED; FULLY DRYWALLED; HUGE kitchen island; Open floor plan; His and Her sinks. . . . First $1000 deposit takes this home off the market. . . ."

**Lack of Valid Electronic Signature Authorizations**

11. On or about May 20, 2023, from the dealership, the Plaintiffs were connected by Maynard to a loan agent with Defendant Vanderbilt, Todd Lewelling, who initiated (a) electronic record and signature agreements (E-sign), and (b) a joint electronic credit application. There was no explanation of standards of eligibility for use of E-sign in the later contracting process, but only that the credit application was being submitted remotely through this means.

12. E-sign can be used for a transaction when every party has agreed to enter into contract terms by electronic means. See 15 U.S.C. § 7001(c)(1). It is designed to facilitate remote transactions where parties are not in the same location for contractual purposes.

13. Prior to consenting, each consumer must be given a clear and conspicuous statement of (1) any right or option to get the copy of the contract in non-electronic form, (2) the right to withdraw consent and the procedures for and consequences of doing so, (3) what transactions the consumer's consent applies to, (4) the procedures for updating the information needed to contact the consumer electronically; and (5) how, after consenting to electronic provision of the information, the consumer may request a paper copy and whether any fee will be imposed. *See* 15 U.S.C § 7001(c)(1)(B*). To have a valid transaction effectuated by E-sign, each consumer must also be given a statement of the hardware and software requirements for access to and retention of electronic records. See 15 U.S.C § 7001(c)(1)(C)(i). Most importantly, for the consumer's consent to be valid, the consumer must consent "electronically . . . in a manner that reasonably demonstrates that the consumer can access information in the electronic format that will be used to provide the information that is subject of the consent." 15 U.S.C § 7001(c)(1)(C)(ii). This requirement to consent in a manner that demonstrates that the consumer can access the electronic record is a critical test of the validity of the consent. See id. This means that consumers must demonstrate, not just affirm, that they have access to the equipment and programs necessary to receive, open and read the relevant electronic documents. See 146 Cong. Rec. S5213 (June 15, 2000).*

14. In implementing the above requirements of the Act relative to hardware, software and capability, the Agreement presented to Plaintiffs provided that:

. . . To successfully transact business with us electronically, you must have access to:

- A computer capable of accessing the internet and sending and receiving e-mail,
- An active email address,
- A printer if you wish to print out and retain records on paper, and electronic storage if you wish to retain records in electronic form,
- Microsoft Windows 7 or later versions, IOS 9 or later, Android 5 or later, or Apple Mac OOS X Leopard (10.5) or later versions, and
- An internet browser that supports 129-bit encryption. (VMF ##382,553)

15. Gary Casdorph did not meet, and could not have met, these requirements of the law in this context sufficient to permit the use of electronic document signings for this transaction. Specifically, Gary Casdorph could not access a computer or make use of any of the other services/devices listed.

**Payment of "First $1000 Deposit" for Agreed Purchase Price**

16. Plaintiffs paid the $1000 deposit toward the agreed purchase price of $97,500 in two $500 cash payments, one on May 26, 2023, and the other on June 2, 2023.

**Vanderbilt's Failure to Meaningfully Evaluate the Plaintiffs' Ability to Repay**

17. Before approving the Casdorphs' mortgage loan, Vanderbilt had the statutory duty to meaningfully evaluate the Casdorph's ability to repay according to terms that it would prescribe.

18. Vanderbilt used very unrealistic monthly expenses in evaluating the Casdorphs' loan.

19. Vanderbilt did not consider many factors affecting the Casdorph household income, including but not limited to, the time-limited nature of Diana Casdorph's employment as a care-giver for someone in failing health, how Gary Casdorph's handicap affected his income prospects, and the seasonal nature of Gary Casdorph's employment.

20. Vanderbilt applied excessive terms that made it more difficult to repay the offered loan. Vanderbilt applied a very excessive rate for a home secured mortgage applied in the context of taking a security interest in Plaintiffs' unsecured residential lot at a time when market interest

rates on prime home mortgages were in the 3.5% to 3.75% range. And in the event of force placed insurance Vanderbilt intended to force-place an exploitive policy that adds in a hefty profit margin for Vanderbilt with minimal benefit to the consumer, an additional cost that would be likely to push the consumers into default.

21. Vanderbilt purported to make a determination that the Plaintiffs had the ability to repay the loan according to its terms.

22. Vanderbilt has developed a residual income model as part of its internal underwriting process. The model subtracts food, healthcare, gasoline, and utility expenses; monthly recurring debt obligations; and the mortgage payment from the applicant's monthly income. Any positive amount left over after this calculation is considered the applicant's net residual income and Vanderbilt evaluates it along with the applicant's assets, debts, and credit profile to determine the consumer's ability to repay the loan.

23. Vanderbilt's Living-Expense Estimate relies on unreasonable living-expense figures. When estimating an applicant's living expenses, Vanderbilt does not consider other borrower characteristics or geographical variations in living expenses.

24. Vanderbilt's loan-underwriting policy permitted the company to rely on its implausible Living-Expense Estimates to approve the exploitive rate Casdorph loan without sufficient income to cover their likely living expenses after paying their significant debt obligations each month.

**Vanderbilt Forwarding of Preclosing Document**

25. On or about September 25, 2023, Defendant Vanderbilt forwarded the requisite early Closing Disclosure to Plaintiff Diana Casdorph but not to Plaintiff Gary Casdorph. The documents indicated that the Closing was scheduled for September 28, 2023.

26. In response to the Disclosure of the Loan Amount stated therein, Plaintiff Diana Casdorph observed and texted the sales agent about the error in the agreed price, reminding him that "our sale price was $97,900. Remember you had to change the numbers." Plaintiffs were given no reason to believe that the agreement on price would not be forthcoming.

**Legal Standards For A Valid Mortgage Loan Closing vs. The Plaintiffs' Closing at the Barboursville Lot on September 28, 2023**

27. Residential Mortgage Loan Closings involve compliance with requirements of federal and state law:

(a) A residential mortgage loan closing in West Virginia involves the practice of law, which therefore requires it to be conducted/directed by an attorney;

(b) The Federal Truth in Lending Act requires disclosure of specific credit terms *prior to consummation* in a form the consumer can keep in order to allow knowledge and consideration of credit terms.

(c) State law has specific mandates as to the content of a deed of trust, and a number of specific prohibitions and limitations specific as to residential mortgage loans. W.Va. Code 31-17-8. Willful disregard of any one of these provisions allows for equitable relief of cancellation of the loan. These include:

(i) a lender may not misrepresent the amount . . . paid to a third party for . . . a service. W.Va. Code 31-17-8(m)(1).

(ii) a lender may not secure a mortgage loan by any security interest in personal property unless affixed. W. Va. Code 31-17-8(m)(5).

(iii) each borrower must be provided a signed copy of all documents executed at the closing. W.Va. Code 31-17-8(j)(6).

(d) In an effort to assure closings are handled in a professional setting, Defendant Vanderbilt distributes to at least some of its closing attorneys the following **CLOSING INSTRUCTIONS** which have the following bold introductory paragraph: **"Attention Attorneys, Title Companies or 3rd Party Notaries: You must facilitate the execution of all Lender documents for this loan closing. This closing must take place at your office or another location approved by the Lender. (Under no circumstances can this closing be conducted at the Home Center, customer(s)' home and restaurants."** The instructions later direct that in West Virginia and certain other states the closing must be conducted under the direction of a state licensed attorney.

28. (a) The Casdorph closing was conducted at Defendant CMH's lot in Barboursville beginning at or after 3 PM on September 28, 2023.

(b) The closing was conducted by Travis Townsend, Sales Manager at the Defendant CMH's Lot. Present at the Closing were the three Casdorphs, the notary/attorney Bernard T. Nibert, the sales agent Brandon Maynard, and CMH Manager Travis Townsend, who directed the closing and did most of the speaking. As the Manager turned the pages of the documents for signature, he placed many of the pages in a separate stack (presumably the electronic documents) indicating he would deal with those later. The notary/attorney, who spoke very little, left once the hand signed and notarized documents were completed.

(c) The closing was directed by CMH Manager. The $412 fee charged the Plaintiffs for "Attorney/Closing Fee" was paid NOT to the attorney but to Title First who was not present at the closing. Of the $412 charged the Plaintiffs for Attorney/Closing Fee, the attorney was in fact paid only $100.

29. Except to enable the obfuscation of the cost and transaction details to the Casdorphs, there was no reason to consider the use of remote electronic signing of the major transaction documents because all parties were present at closing at the Barboursville lot. The transaction details, including the total sale price, the interest rate, and monthly payment were critical details to the Casdorphs. Oral presentation of these details was especially critical to Plaintiff Gary Casdorph, who relies on oral presentation of numerical amounts in transaction decision making. In the context of a $100,000 plus mortgage loan, the most important consumer transaction in the lives of the Plaintiffs, it was especially important for all documents to be presented, terms and import explained by the professional, and signed copies provided.

30. (a) There was no meaningful opportunity afforded the Plaintiffs to learn of the terms contained in the stack of documents that the Manager set aside to be dealt with later.

(b) The following documents (and thirteen other transaction documents and disclosures) to which their electronic signatures were attached were not provided to the Plaintiffs at the closing (capital letters, underlining, boldness as in original), but contained in the later email to Diana Casdorph only in the following order:

(i) **Closing Disclosure** (This five-page Truth in Lending required disclosure document for a mortgage transaction set forth essential terms including but not limited to Loan Amount, Interest Rate, Monthly Principal and Interest, Loan Costs, other Costs, Total of Payments, Finance Charge, and Annual Percentage Rate)

(ii) **SALES AGREEMENT**. (This document contained the **Home Price** as the first disclosure.)

(iii**) Important Closing Notice to Borrower(s**) <u>This Important Closing Notice is being provided to each borrower prior to the signing of the loan documents</u>

(This document goes through the factors that Vanderbilt relied upon in making the Ability To Repay determination. . Thereafter it has the borrowers confirming seven factors including that the borrower read fully the factors and confirmed the monetary amounts as well as other personal information set forth therein as accurate and complete. This document was after hand-signed signed documents including the deed of trust, and other documents consummating the transaction (e.g. sales agreement) in the later email, not "prior to the signing".)

(iv) **MONTHLY HOUSEHOLD LIVING EXPENSES CONFIRMATION** ( supposedly a part of the Truth in Lending Ability to Pay pre-signing determination)

(v) **CONSUMER LOAN NOTE AND SECURITY AGREEMENT (**containing the principal and note rate of interest and the remainder of the terms of the loan)

31. Details not explained to the Casdorphs at the closing contained (a) the total sale price, (b) the cash price, and (c) the annual percentage/interest rate. Had the Plaintiffs known at the time that they were not getting the agreed sale price of $97,500, or that they were being obligated to pay over $370,000 for this single-wide, or that they would be paying $245,000 in finance charges, they would have reconsidered.

32, The Plaintiff Gary Casdorph never signed a valid Sales Agreement or Consumer Loan Note and Security Agreement.

33. After the Plaintiffs left the closing, Plaintiff Diana Casdorph received an email with the nineteen closing documents she was not afforded the opportunity to understand at closing. Plaintiff Gary Casdorph received nothing by email or in any form. They did not leave with a signed copy of all documents executed at closing.

**Willful Disregard of the Prerequisites for a Valid Residential Mortgage Loan**

34. Relative to the making of a residential mortgage loan, West Virginia law mandates that:

- a lender may not misrepresent the amount . . . paid to a third party for . . . a service. W. Va. Code § 31-17-8(m)(1)

- a lender may no secure a mortgage loan by any security interest in personal property unless affixed. W. Va. Code § 31-17-8(m)(5).

- each borrower must be provided a signed copy of all documents executed at the closing. W. Va. Code 31-17-8(j)(6).

Willful disregard of any one of these mandates, in addition to other relief, allows for the equitable relief of cancellation of the loan. W. Va. Code s 31-17-17.

35. The Closing Disclosure set forth that $105 was being paid to third parties for governmental fees. In fact, a portion was being retained by Defendant Vanderbilt and not paid to third parties.

36. The Deed of Trust rider provided for a security interest in personal property.

**Exploitive Servicing by Vanderbilt**

37. Defendant Vanderbilt took the Plaintiffs' 3.6 acre unencumbered residential tract as security but placed them in financing with an exploitive note rate of 11.25% at a time when prime home mortgage rates were in the 3.5-3.75% range and subprime rates far less. This exploitive rate rendered their monthly payment before escrow was in excess of $1200.

38. The Plaintiffs had intended to move their prior singlewide on the residential property to the eastern corner of the 3.6 acre parcel, refurbish it for their daughter, who would then be able to help with the affordability of monthly payments. After closing and installation of the

new home, the Plaintiffs were informed by Vanderbilt that the home had to be removed entirely from the property and gave them 30 days to accomplish removal under threat of repossession.

39. When Plaintiffs' $800/year hazard insurance was not renewed, rather than work with them in the short term, Vanderbilt immediately force-placed high cost/low consumer benefit hazard insurance which contained a high dollar profit margin to Vanderbilt. This event more than doubled ($1851/year) the monthly cost of insurance to Plaintiffs and pushed them outside the limits of monthly payment affordability.

40. In or about early January, 2025, the Plaintiffs conveyed to Vanderbilt their hardship circumstances and requested a loan modification. The request was rejected.

**Damages**

41. The Plaintiffs have been subjected to annoyance and inconvenience, fear of loss of home, emotional distress, damage to credit and economic loss.

## CLAIMS FOR RELIEF

42. (a) The Defendants Vanderbilt and CMH were notified by Notice of Opportunity to Cure pursuant to W. Va. Code § 46A-5-108, on August 1, 2024, of Plaintiff's intention to bringing claims under the WVCCPA

(b) The Plaintiff offered the said Defendants an opportunity to cure within 45 days of official receipt of the notice, after which time the WVCCPA claim hereinafter set forth became ripe for prosecution.

(c) The Defendants responded timely but no such resolution occurred.

## COUNT I—UNCONSCIONABLE INDUCEMENT AND UNCONSCIONABLE CONTRACT

43. The Plaintiffs incorporate the preceding paragraphs by reference.

44. The Plaintiffs and the Defendants occupy dramatically unequal bargaining positions, including that:

(a) Plaintiffs are unsophisticated in mortgage loans and home financing, and have limited or no ability to deal with mortgage financing in the context of electronic documentation.

(b) Defendant VMF is a large national lender engaged in the business of making home secured loans.

(c) Defendant CMH is a large national manufacturer and merchant of mobile homes.

45. The Defendants deceptively induced the Plaintiffs into the exploitive financing by misrepresenting the sale price, and by applying exploitive rates and terms to the financing secured by the Plaintiffs' own residential lot.

46. The Defendants suppressed essential terms of the transaction and the model year of the home

47. The Defendants did not utilize accurate data to underwrite the Ability to Repay consistent with federal law.

46. The Defendants made illegal use of E-sign documentation to induce Plaintiff Gary Casdorph into the transaction without his having the ability to access the documents. The Defendants made use of electronic signature documentation when all the parties were present at the closing as a means to avoid meaningful paper disclosure of credit terms.

47. The Defendants used unreasonable criteria and factors in underwriting the Casdorphs' ability to repay the excessive cost loan in violation of federal law

48. The contract was formed without a true meeting of minds through a residential mortgage loan closing inconsistent with state and federal law:

(a) The closing was not conducted by the licensed professional or performed in a professional location;

(b) The preclosing review of ATR factors was not timely conducted, if at all;.

(c) The process allowed for suppression of the essential terms of the transaction by the failure to provide a copy of disclosures the consumer could keep prior to execution;

(e) The review of federally mandated disclosures was either not done at all or after execution of sales and security documents;

(f) The transaction was induced by the attaching of electronic signatures to disclosure documents after the completion of the closing transaction.

49. The financing transaction was induced by failure to afford a meaningful opportunity to understand the parameters and terms of the transaction. The contract at issue was adhesive and drafted by said Defendants and their agents.

49. The transaction contained illegal terms and fees under West Virginia law.

50. The loan was unconscionable, under all circumstances alleged, at the time it was made and/or was induced by unconscionable conduct, and therefore is unenforceable.

**WHEREFORE**, Plaintiffs respectfully request the following relief:

(a) A declaration that the transaction was induced by unconscionable conduct and/or contained unconscionable terms, and constituted unconscionable contract; and

(b) All appropriate equitable, penalty, and other relief to which the Plaintiff may be entitled, plus costs and fees.

## COUNT II—ILLEGAL MORTGAGE LOAN

51. The Plaintiffs incorporate by reference all preceding paragraphs.

52. The Plaintiffs allege that the mortgage loan contained fees for services in excess of those paid to third parties, and fees that were unlawful, all in violation of W.V. Code § 31-17-8(m)(1).

53. The Plaintiffs allege that the mortgage loan contains a security interest in unaffixed personal property, and by rider not intended to be, in violation of W.Va Code § 31-17-8(m)(5).

54. The Plaintiffs allege that copies of all executed mortgage loan documents were not provided to each of the Plaintiffs at closing, all in violation of W.Va. Code § 31-17-8(j)(6).

55. The Plaintiffs allege that Defendants' violations of W.Va. Code § 38-17 were knowing and willful.

**WHEREFORE**, the Plaintiffs pray that the mortgage loan be cancelled, for fees and costs, and other appropriate relief.

**COUNT III—FRAUD**

56. The Plaintiffs incorporate the preceding paragraphs by reference.

57. The Plaintiffs allege that the Defendants misrepresented the sale price of the mobile home and suppressed facts about the cost the transaction and the model year of the home.

58. The Plaintiffs allege that the misrepresentations and suppressions were intentional and/or reckless.

59. The Plaintiffs allege that these misrepresentations and suppressions pursued by Defendants involved issues of cost and affordability that were material to their consummation of the transaction.

60. The Plaintiffs allege that they relied upon the represented price and beliefs about the terms of the transaction in entering into the transaction.

61. The Plaintiffs allege that they were damaged by entering into the transaction upon their reliance upon the representations of the Defendants.

**WHEREFORE**, Plaintiffs respectfully request the following relief:

(a) A declaration that the transaction was induced by fraudulent conduct; and

(b) All appropriate equitable and legal relief to which the Plaintiffs may be entitled, plus costs and fees.

**COUNT IV—VIOLATION OF TILA MINIMUM UNDERWRITING STANDARDS.**

62. The Plaintiffs incorporate the preceding paragraphs by reference.

63. Vanderbilt originates mortgage loans to consumers to finance the purchase of manufactured homes, primarily homes sold and manufactured by affiliated companies that are owned by Vanderbilt's parent, Clayton Homes, Inc.

64. Before originating a mortgage loan, Vanderbilt has the duty to make a reasonable and good faith determination at or before consummation that the consumer has the ability to repay the loan according to its terms.

65. TILA and its implementing regulation, Regulation Z, set forth minimum underwriting standards for consumer-credit transactions secured by a dwelling. 15 U.S.C. § 1639c, 12 C.F.R. § 1026.43. Vanderbilt's dwelling-secured mortgage loans must meet Regulation Z's minimum underwriting standards.

66. TILA provides that "In accordance with regulations . . . , no creditor may make a residential mortgage loan unless the creditor makes a reasonable and good faith determination based on verified and documented information that, at the time the loan is consummated, the

consumer has a reasonable ability to repay the loan, according to its terms, and all applicable taxes, insurance (including mortgage guarantee insurance), and assessments." 15 U.S.C. § 1639c(a)(1). In turn, the Regulation Z provides that a creditor, such as Vanderbilt, "shall not make a loan that is a covered transaction unless the creditor makes a reasonable and good faith determination at or before consummation that the consumer will have a reasonable ability to repay the loan according to its terms." 12 C.F.R. § 1026.43(c)(1).

67. "(W)hether a particular ability-to-repay determination is reasonable and in good faith will depend not only on the underwriting standards adopted by the creditor, but on the facts and circumstances of an individual extension of credit and how a creditor's underwriting standards were applied to those facts and circumstances." 12 C.F.R. pt. 1026 supp. I, cmt. 43(c)(1)-1.i. Additionally, the fact that the "creditor disregarded evidence that the consumer may have insufficient residual income to cover other recurring obligations and expenses, taking into account the consumer's assets other than the property securing the loan, after paying his or her monthly payments for the covered transaction, any simultaneous loans, mortgage-related obligations, and any current debt obligations" is "evidence that a creditor's ability-to-repay determination was not reasonable or in good faith." 12 C.F.R. pt. 1026 supp. I, cmt. 43(c)(1)-1.ii.B.5.

68. Vanderbilt made a mortgage loan to the Casdorphs without making a reasonable and good-faith determination that the borrowers could repay them according to the terms afforded them in violation of TILA, 15 U.S.C.§ 1639c(a)(1), and Regulation Z, 12 C.F.R. § 1026.43(c).

**WHEREFORE**, the Plaintiffs pray for all legal and equitable relief, including civil penalties and enhanced damages pursuant to 15 U.S.C. 1640(a)(d), fees and costs and all other appropriate relief.

## COUNT VI—UNCONSCIONABLE DEBT COLLECTION

69. Plaintiffs incorporate the previous paragraphs by reference.

70. Defendant Vanderbilt's efforts as a whole in the servicing of the loan as hereinbefore alleged were intended to place Plaintiffs in a hardship position and in default and amounts to unconscionable debt collection in violation of W. Va. Code § 46A-2-128.

**WHEREFORE**, Plaintiffs respectfully request the following relief:

(a) Actual damages;

(b) A civil penalty for each violation of the WVCCPA pursuant to W. Va. Code §§ 46A-5-101, -106;

(c) Reasonable attorneysfees and the costs of this action pursuant to W. Va. Code § 46A-5-104; and

(d) Such other relief as the Court deems equitable and just.

**COUNT VII—UNENFORCEABLE LOAN**

71. Plaintiffs incorporate the preceding paragraphs by reference.

72. The Defendants Vanderbilt Mortgage and CMH pursued an E-sign agreement with the Plaintiff Gary Casdorph without his having demonstrated compliance with statutory requirements and without his qualifying to enter into the agreement, all in violation of 15 U.S.C. 7001(c)(1).

73. The transaction documents bearing his electronic signature are therefore forged and without force and effect.

.74. The Plaintiffs were damaged as a proximate result of the Defendants' illegal conduct. .

**WHEREFORE**, Plaintiffs respectfully request all appropriate legal and equitable relief.

.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

**Plaintiffs,**
**GARY W. CASDORPH, and**
**DIANA L. CASDORPH**
**By Counsel:**

/s/ Daniel F. Hedges
Daniel F. Hedges (WVSB # 1660)
Sarah K. Brown (WVSB # 10845)
MOUNTAIN STATE JUSTICE, INC.
1217 Quarrier St,
Charleston, WV 25301
Telephone: (304) 344-3144
Facsimile: (304) 344-3145
***COUNSEL FOR PLAINTIFFS***