**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**HUNTINGTON DIVISION**

| | |
|---|---|
| GARY W. CASDORPH and<br>DIANA L. CASDORPH,<br><br>PLAINTIFFS,<br><br>V.<br><br>VANDERBILT MORTGAGE & FINANCE, INC.,<br><br>DEFENDANT. | CASE NO. 3:25-CV-213 |

**VANDERBILT MORTGAGE AND FINANCE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Carrie Goodwin Fenwick (WV Bar 7164)
GOODWIN & GOODWIN, LLP
300 Summers Street
Suite 1500
Charleston, West Virginia 25301
(304) 346-7000
cgf@goodwingoodwin.com

James C. Lester (Visiting Attorney ECF No. 33)
Nicolas H. Peck (Visiting Attorney ECF No. 34)
MAYNARD NEXSEN PC
1901 6th Ave. North
Suite 1700
Birmingham, Alabama 35203
(205) 254-1000
jlester@maynardnexsen.com
cpeck@maynardnexsen.com

*Attorneys for Vanderbilt Mortgage and Finance, Inc.*

Vanderbilt Mortgage & Finance's ("VMF") business is getting people into homes and financing those purchases responsibly. Because VMF retains 99.9% of relevant loans in its portfolio, it only loses money when borrowers default. That incentive drives VMF to underwrite carefully and ensure borrowers know their loan terms. That is exactly what happened here. VMF conducted a thorough underwriting analysis and, for months, repeatedly disclosed every material loan term. Those terms satisfied federal Qualified Mortgage thresholds and had an interest rate below the average for comparable West Virginia loans. After closing, Diana Casdorph rated her experience "really good" and brought homemade salsa as a thank-you gift to her sales agent.

Unfortunately, life intervened. Gary Casdorph's unexpected medical complications and job loss caused payment difficulties. The Casdorphs now recast their "really good" transaction as one tainted by fraud and illegality, claiming VMF suppressed loan terms and failed to evaluate their ability to repay. The undisputed record of repeated disclosures and rigorous, QM-compliant underwriting shows otherwise. VMF is entitled to judgment as a matter of law.

## STATEMENT OF UNDISPUTED FACTS

### I. The Casdorphs' Loan Applications with VMF

1. VMF originates loans for the purchase of manufactured homes. **Exhibit 1 to Motion ("Ex. 1")**, Moore Decl., at ¶ 2. On May 20, 2023, Diana and Gary Casdorph visited a CMH Homes, Inc. ("CMH") retail home center in Barboursville. **Ex. 4**, Diana Dep., at 23:2–16. Brandon Maynard, a CMH sales employee, assisted the Casdorphs in choosing a manufactured home at the retail center. *Id.* Diana and Gary both signed a sales worksheet listing the sales price of the home. **Ex. 13**. Maynard assisted the Casdorphs in submitting a loan application to lenders, including VMF. **Ex. 4**, Diana Dep., at 23:11–21, 24:11–20; **Ex. 2**, Maynard Decl., at ¶ 3.

2. The loan application asks applicants about their monthly living expenses, including

food, clothing, gasoline, and health care.[1] **Ex. 1-A**, VMF-Casdorph_0000850. On their loan application, the Casdorphs listed the following: $200 for food, $0 for clothing, $200 for gasoline, $0 for health care, and $0 for 401(k) repayment. *Id.*

3. VMF had previously denied four loan applications from the Casdorphs. **Ex. 1-F**.

4. Todd Lewelling, a VMF loan originator, reviewed the Casdorphs' May 2023 loan application. **Ex. 7**, Lewelling Dep., at 8:15, 9:2, 19:24–20:17. After "dig[ging] into" their credit history, Lewelling contacted his supervisor to "g[e]t a second set of eyes" on their application. *Id.* at 22:9–17. His supervisor agreed that VMF should offer the loan. *Id.* at 36:13–37:10. At that time, the Casdorphs' credit reports showed that all accounts were being paid as agreed except for one, Diana's credit report had no bankruptcies or public record items remaining, and Gary's income was higher than that reported on previous loan applications. **Ex. 19-A**, Courchane Report, at ¶ 110; **Ex. 1-E**, VMF-Casdorph_0001694. The credit reports did not show a car loan for Gary. **Ex. 1-B**.

5. VMF keeps 99.9% of loans it originates similar to that of the Casdorphs in portfolio rather than selling them to the secondary market. **Ex. 19-A**, Courchane Report, at ¶ 100 and Table 8. Because VMF "bear[s] the credit risk on the loans," it "has every incentive to underwrite the loans carefully and in accordance with ability-to-repay and residual income guidelines." *Id.*

## II. Pre-Closing Disclosures

6. On May 23, 2023, Lewelling called Diana to confirm the figures listed on the

[1] The categories in the loan application mirror the categories of living expenses listed in the commentary to the Truth in Lending Act's ("TILA") implementing regulation, Regulation Z. 12 C.F.R. § Pt. 1026, Supp. I, Part 3, 43(e)(1)(ii)(1). In addition to calculating applicants' living expenses based on their reported monthly living expenses plus a utilities estimate, VMF also calculates living expenses using a standard amount of $425 per month for the applicant, $70 per month for the co-applicant, and $100 per month for utilities for a single-section home. **Ex. 6**, Moore Dep., at 9:22–10:9, 11:7–12:24. After comparing the two totals, VMF uses the higher number as the applicant's monthly living expenses. *Id.* at 9:22–10:9. Because the living expenses reported by the Casdorphs were higher than the figure produced by the formula, VMF used the reported living expenses in its underwriting of the loan.

application. Diana confirmed those amounts. **Ex. 22**, 2023.05.23 Tr. at 10:9–12:20.[2] She clarified they paid for "Mountain Flex benefit" of $144 per month. *Id.* at 10:9–11:19. VMF updated its underwriting to include those health care costs. **Ex. 1-E**, VMF-Casdorph_0001692–93.

7. Lewelling also confirmed the Casdorphs' other debt obligations as identified from the credit reports. **Ex. 22**, 2023.05.23 Tr. at 12:21–16:18. When Lewelling listed the Casdorphs' loans and asked if the list was correct, Diana said "yes" and did not mention a $700 monthly payment for Gary's car. *Id.* at 14:4–9. Post-closing, Diana confirmed that her car loan was the only one. **Ex. 28**, 2024.02.09 Tr. at 15:8–17. Lewelling also confirmed that there were no simultaneous loans on the land the Casdorphs wanted to use as collateral. **Ex. 22**, 2023.05.23 Tr. at 4:7–16.

8. Lewelling then offered the loan and orally disclosed all key loan terms. He told Diana the total sales price ($111,951.71), amount financed ($121,371 rounded), interest rate (11.25%), and total monthly payment ($1,377.50). *Id.* at 20:22–26:21. During the call, Diana asked Lewelling to slow down so she could write down the terms to tell Gary later. *Id.* at 21:23–22:3. As to the interest rate, Diana responded: "Oh, that's not too awful bad." *Id.* at 24:12–14. Diana relayed the terms to Gary before closing. **Ex. 4**, Diana Dep., at 73:12–15.

9. On May 23, Diana received a Preliminary Loan Terms Sheet by email. **Ex. 14**; **Ex. 4**, Diana Dep., at 76:19–77:19. The loan terms were the same as those disclosed by Lewelling. **Ex. 14**. Diana reviewed the terms closely enough to notice that the listed sales price differed from an advertisement, and she texted the CMH sales employee to ask about a price reduction. **Ex. 10**.

10. On May 24, Diana received a conditional loan approval ("CLA"). **Ex. 1-L**. The CLA listed the same terms previously disclosed to Diana. *Id.* Diana received revised CLAs on June 2, June 14, June 30, and September 14. **Ex. 1-M**, VMF-Casdorph_0000376–78, 380–82, 415–

[2] All phone call recordings referenced herein are authenticated by the Moore Declaration, **Ex. 1**, and will be provided to the Court. For the Court's convenience, a court reporter transcribed each recording, which are the cited Exhibits.

20. Each listed the revised loan amount, interest rate, and estimated monthly payment. *Id.*

11. The original and revised CLAs expired on September 20, 2023. **Ex. 1-L**; **Ex. 1-M**, VMF-Casdorph_0000376–78, 380–82, 415–20. VMF called the Casdorphs to get their permission to reactivate the loan and re-pull their credit reports, and Gary and Diana both verbally agreed. **Ex. 25**, 2023.09.20 Tr. at 2:13–23, 6:3–10.

12. VMF's rate sheet for September 2023 listed an 11.75% interest rate. **Ex. 19-A**, Courchane Report, at ¶ 74. However, on September 23, 2023, VMF overrode the higher rate of 11.75% and provided the original 11.25% rate for the loan. **Ex. 1-E**, VMF-Casdorph_0001602.

13. On September 25, 2023, Diana received another revised CLA. **Ex. 1-M**, VMF-Casdorph_0000369–71. The amount of the monthly payment originally disclosed and the amount on this disclosure differed by only $0.72. That day, VMF also sent the pre-closing disclosure to Diana via email. **Ex. 15**. It listed an estimated monthly payment of $1,371.26, an amount lower than any of the CLAs. *Id.* VMF notified Diana via text about the pre-closing disclosure. **Ex. 1-K**, VMF-Casdorph_0001723; **Ex. 8**, Smith Dep., at 15:10–12; **Ex. 1-E**, VMF-Casdorph_0001592.

14. Diana signed the pre-closing disclosure the same day. **Ex. 15**, CASDORPH000526. She reviewed the disclosure closely enough to notice a perceived price discrepancy, about which she texted CMH. **Ex. 4**, Diana Dep., at 107:14–17; **Ex. 10**.

15. On May 30, 2023, VMF informed Diana that a stipulation for their loan was that a structure on the property had to be removed prior to funding. **Ex. 23**, 2023.05.30 Tr. at 5:22–6:2. Diana responded that the structure would be "torn down" and "done away with completely." *Id.* at 6:14–23. The next day, Diana confirmed the same. **Ex. 24**, 2023.05.31 Tr. at 5:5–9:4.

## III. VMF's Underwriting

16. In underwriting, VMF confirmed Diana's income using Equifax's verification

service. **Ex. 1-C**. VMF confirmed Gary's income using a request for verification of employment form. **Ex. 1-D**. The Casdorphs' total gross monthly income was $6,372.26. At an 11% tax rate, the Casdorphs had a net monthly income of $5,671.32. **Ex. 19-A**, Courchane Report, at ¶ 90.

17. VMF pulled Diana's and Gary's credit reports and used the information on the reports to calculate $1,721 for the Casdorphs' other monthly debt obligations. **Ex. 1-B**; **Ex. 1-G**.[3] VMF added insurance and taxes to the P&I payment of $1,209.45 to calculate the monthly payment for mortgage-related obligations as $1,371.26. **Ex. 1-G**. VMF calculated the primary housing ratio of 21.52% and the debt-to-income ratio of 48.53%. *Id.*

18. After subtracting the monthly house payment of $1,371.26 and other monthly debt obligations of $1,721 from net income, the Casdorphs had residual income of $2,579.06.[4] *See also* **Ex. 1-K**, VMF-Casdorph_0001715 (VMF calculated residual income as $2,515.39 using conservative 12% tax rate). This residual income was sufficient to cover the total living expenses reported by the Casdorphs to VMF. *See* Statement of Undisputed Facts ("SUF") ¶¶ 2, 6.

19. Through its underwriting process, VMF therefore considered the Casdorphs' income, current employment status, the monthly payment on the loan, the monthly payment on any simultaneous loans if they existed, the monthly payment for mortgage-related obligations, debt obligations including alimony and child support, debt-to-income ratio, residual income, and credit history in underwriting the loan. *See* **Ex. 7**, Lewelling Dep., at 72:11–73:14.

## IV. Loan Terms and Closing Costs

20. Ultimately, the Casdorphs' loan with VMF is a 25-year, fixed-rate conventional

---

[3] The Casdorphs had no monthly alimony or child support payments. **Ex. 1-A**, VMF-Casdorph_0000851.

[4] The residual income test as defined in Regulation Z requires lenders to consider "remaining income after subtracting the consumer's total monthly debt obligations." 12 C.F.R. § 1026.43(c)(7)(ii)(B). Additionally, the "appropriate threshold for a consumer's monthly debt-to-income ratio or monthly residual income is for the creditor to determine in making a reasonable and good faith determination of a consumer's ability to repay." 12 C.F.R. Pt. 1026, Supp. I, Part 3, 43(c)(7)(1).

loan with an interest rate of 11.25% and a principal amount of $121,157.88. **Ex. 1-R**, VMF-Casdorph_0000596. The annual percentage rate ("APR") for the loan was 11.696%. **Ex. 12**, CASDORPH000142. The total monthly payment matched the pre-closing disclosure. *Id.* at 138.

21. In 2023, for non-prime loans across all other lenders in West Virginia in 2023, the average interest rate was 11.41%. **Ex. 19-A**, Courchane Report, at ¶ 75 and Table 3. The Casdorphs' rate fell below the average. The average prime offer rate ("APOR") for a comparable transaction on the rate lock date of September 21, 2023 was 7.05%. *Id.* at ¶ 112.

22. To be a Qualified Mortgage under TILA, a loan must be within the allowable APR spread, as adjusted for inflation. 12 C.F.R. § 1026.43(e)(2)(vi). When adjusted for inflation, the allowable spread between the APR and the APOR in 2023 was 6.5% for a first-lien covered transaction secured by a manufactured home with a loan amount less than $124,331.[5] 12 C.F.R. § Pt. 1026, Supp. I, Part 3, Para. 43(e)(2)(vi)(3)(ii)(D). The Casdorphs' loan was less than $124,331, and its APR of 11.696% was less than the 7.05% APOR plus the allowable spread of 6.5%. The Casdorphs' rate was therefore within the federal Qualified Mortgage thresholds.

23. The Casdorphs' loan included certain closing costs. **Ex. 12**; *see also* **Ex. 1**, Moore Decl., at ¶ 14. Of those, the home protection plan was an optional product. **Ex. 1-H**; **Ex. 1-I**; *see also* **Ex. 1-U**. The Casdorphs were required to maintain insurance, but they were not required to buy that insurance from American Bankers. **Ex. 1-I**; *see also* **Ex. 1-U**.[6] Both the premium and term of the American Bankers' policy were disclosed to the Casdorphs. **Ex. 1-P**; **Ex. 1-J**.

24. All fees charged were for actual services rendered. **Ex. 1**, Moore Decl., ¶ 19. Each

[5] "The threshold in § 1026.43(e)(2)(vi)(D) applies to first-lien covered transactions less than $110,260 (indexed for inflation) *that are secured by a manufactured home and land*, or by a manufactured home only." 12 C.F.R. § Pt. 1026, Supp. I, Part 3, Para. 43(e)(2)(vi)(6) (emphasis added).

[6] The deed of trust and the consumer loan note both include provisions requiring the Casdorphs to maintain property insurance and authorizing VMF to obtain lender-placed insurance at the Casdorphs' expense if coverage lapsed. **Ex. 1-Q**, VMF-Casdorph_0000523–524; **Ex. 1-R**, VMF-Casdorph_0000597.

of the fees were paid to the party listed in the disclosure. *Id.* at ¶ 20. Other than the origination fee, VMF had no discretion over the amounts. **Ex. 8**, Smith Dep., at 10:10–14.

25. Title First Agency, Inc., Nationwide Appraisal Network, LLC, Gunnoe Surveying Mapping, closing agent Lisa Balderson, Esq., and closing attorney Bernard Nibert are third parties and not affiliates of VMF. **Ex. 1**, Moore Decl., at ¶ 15. For fees to these third parties, neither VMF, nor any affiliate of VMF, received any compensation. *Id.* at ¶ 16. Dr. Marsha Courchane concluded that all fees charged at closing were "within normal ranges." **Ex. 19-A**, Courchane Report, at ¶ 78.

## V. The Closing

26. The loan closed on September 28, 2023. **Ex. 12**. VMF was not present at the closing. **Ex. 4**, Diana Dep., at 150:16–19, 151:15–20. The closing was conducted by Bernard Nibert, an attorney retained by the title company. **Ex. 31**, Nibert Decl., at ¶¶ 1, 4. Nibert is not an employee of VMF nor is he affiliated with VMF. *Id.* at ¶ 3.

27. Nibert presented documents both physically and electronically for the Casdorphs to sign. *Id.* at ¶¶ 5, 7; *see also* **Ex. 2**, Maynard Decl., at ¶¶ 9, 13; **Ex. 3**, Townsend Decl., at ¶ 3–5. The Casdorphs signed the final closing disclosure, which listed the loan amount of $121,157.88, the 11.25% rate, and the monthly payment of $1,371.26. **Ex. 12**. They also signed the consumer loan note obligating the Casdorphs to pay the loan amount as secured by the home as well as a deed of trust granting VMF a security interest in the Casdorphs' land. **Ex. 1-R**; **Ex. 1-Q**. The Casdorphs also signed a document confirming their living expenses as reported to VMF in the application and on the call with Lewelling. **Ex. 16**. Diana admitted the Casdorphs "***signed at the closing***." **Ex. 26**, 2023.10.06 Trans. at 3:12 (emphasis added).

28. Diana received an email with the closing documents after closing. Doc. 19, at ¶ 32. The DocuSign audit trail confirms this. **Ex. 20-A**, Gutierrez Report, at ¶ 40. The DocuSign audit

trail also shows that Diana accessed and viewed the completed closing documents on the evening of the closing. *Id.* at ¶¶ 39–40. In multiple phone calls, Diana stated that she possessed physical copies of the closing documents and later lost them. **Ex. 26**, 2023.10.06 Tr. at 5:5–8; **Ex. 29**, 2025.01.13 Tr. at 5:22–6:1; **Ex. 30**, 2025.01.15 Tr. at 3:19–22.

## VI. Post-Closing Events

29. On October 26, 2023, VMF called Diana to review her loan details. **Ex. 27**, 2023.10.26 Tr. at 2:8–11. VMF explained the breakdown of the monthly payment and told Diana the payment amount. *Id.* at 3:15–5:5. When asked about her experience with VMF, Diana said that "it was really good." *Id.* at 3:13–14. She identified no problems with the closing or with anyone at VMF. **Ex. 4**, Diana Dep., at 128:6–15, 129:9–20. After the closing, Diana brought Maynard homemade salsa as a thank-you gift. *Id.* at 18:14–24, 128:16–129:8.

30. On October 14, 2024, VMF sent the Casdorphs an initial notice that it did not have evidence of insurance and the Casdorphs needed to secure coverage or a lender-placed policy would be issued. **Ex. 17**; **Ex. 1-S**. On November 18, 2024, VMF sent a second notice. **Ex. 17**; **Ex. 1-S**. On December 9, 2024, VMF sent the Casdorphs notice of lender-placed insurance. **Ex. 18**. The Casdorphs ultimately obtained their own policy, cancelling the lender-placed policy. **Ex. 21**.

31. In January 2024, Gary underwent oral surgery. **Ex. 4**, Diana Dep., at 144:8–16. Gary's recovery took longer than expected, which prevented him from working and placed him on short-term disability. *Id.* at 144:17–145:12. Around April 2024, Gary left his job at the West Virginia Department of Highways because of workplace harassment. *Id.* at 145:13–20. Gary's unexpected health issues and job loss caused payment difficulties. *Id.* at 145:8–12; 146:5–8.

## PROCEDURAL HISTORY

On April 1, 2025, the Casdorphs filed their initial Complaint against both VMF and CMH.

Doc. 2. On June 19, 2025, CMH filed a motion to compel arbitration, Doc. 17, and VMF filed a motion to stay, Doc. 18. The next day, the Casdorphs filed their Amended Complaint, dropping CMH as a defendant but retaining all six claims for relief against VMF. Doc. 19.

The Court denied CMH and VMF's motions. Doc. 30. The Court declined to compel arbitration between CMH and the Casdorphs because CMH was "no longer a party to [the] action, and the claims against [VMF] only concern the loan financing transaction, ***not whether CMH's conduct was unlawful***." Doc. 30 at 11 (footnote omitted, emphasis added). The Court reiterated that "[a]t this point, there are simply no claims against CMH." *Id.* (footnote omitted). CMH subsequently obtained an award from the American Arbitration Association stating that it "engaged in no unconscionable actions in connection with the sale and closing," and "did not misrepresent or suppress any material facts to the Casdorphs." **Ex. 11**, AAA Award, at 6.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022).

## ARGUMENT

### I. The Casdorphs' Unconscionability Claims (Count I) fail.

Count I alleges that the loan is unconscionable and that it was induced by unconscionable conduct. *See* W. Va. Code § 46A-2-121(a)(1); *see also McFarland v. Wells Fargo*, 810 F.3d 273, 284–86 (4th Cir. 2016). "Unconscionability is an equitable principle . . . for the court to decide." *Adams v. Little Giant Ladder Sys., LLC*, 765 F. Supp. 3d 523, 529 (S.D.W. Va. 2025) (citation modified). An unconscionable contract claim requires both procedural and substantive unconscionability. *McFarland*, 810 F.3d at 283. Unconscionable inducement requires more than

procedural unconscionability. *Id.* at 286. It requires affirmative misrepresentations, active deceit, or concealment of a material fact. *Id.*; *see also* W. Va. Code § 46A-2-121(a)(1). None are present here.

**A. As a matter of law, the Casdorphs' loan is not substantively unconscionable.**

Substantive unconscionability requires more than a loan that is expensive or difficult to repay. *See McFarland*, 810 F.3d at 280. A contract is only substantively unconscionable if it contains a "gross imbalance" or is "one-sided" and "overly harsh as to the disadvantaged party." *Id.* at 279–80 (citation modified). The Casdorphs' loan does not approach that standard.

The Casdorphs allege that VMF "appl[ied] exploitative rates and terms" to their loan. Doc. 19, at ¶ 45. Every term they challenge other than the interest rate is either a mathematical consequence of the interest rate or is addressed elsewhere.[7] The Casdorphs' interest rate is not unconscionable. Their 11.25% rate falls within TILA's Qualified Mortgage threshold. *See infra* Part IV. An interest rate blessed with a presumption of compliance by TILA cannot make a loan substantively unconscionable. Moreover, the 11.25% rate fell below the 11.41% average for non-prime loans from other West Virginia lenders. SUF ¶ 21. The loan is not substantively unconscionable as a matter of law.

**B. The loan is not the result of procedurally unconscionable conduct nor did VMF unconscionably induce the loan.**

The doctrines of procedural unconscionability and unconscionable inducement exist to prevent "unfair surprise" and "hidden . . . contract terms." *Orlando v. Fin. One of W. Va., Inc.*, 369 S.E.2d 882, 885 (W. Va. 1988) (citation modified); *Brown ex rel. Brown v. Genesis Healthcare*

---

[7] The Casdorphs' allegations reference the $245,000 finance charges. *See* Doc. 19, at ¶ 31. These charges are derivative of the interest rate. The Casdorphs' allegation that the loan contained "illegal terms and fees under West Virginia law" is addressed in Part II, *infra*. *See* Doc. 19, at ¶ 50. The Casdorphs' allegation that the sales price was misrepresented is addressed in Parts I.C and III, *infra*. *See* Doc. 19, at ¶ 45. The Casdorphs' allegation that VMF failed to make a good faith ability-to-repay determination is addressed in Part IV, *infra*. *See* Doc. 19, at ¶¶ 45(b), 48(b).

*Corp.*, 724 S.E.2d 250, 285 (W. Va. 2011) (citation modified), *cert. granted, judgment vacated on other grounds*, 565 U.S. 530 (2012). The Casdorphs' loan contained no unfair surprises or hidden terms—all material terms of the loan were repeatedly disclosed in the months before closing.

VMF disclosed all material terms of the loan on the May 23, 2023 intake call with Diana. SUF ¶ 8. She wrote the numbers down to tell Gary and did, in fact, discuss the terms with him. *Id.* Written disclosures followed. VMF emailed Diana the Preliminary Loan Terms sheet. SUF ¶ 9. VMF later sent *six* conditional loan approval sheets with the loan amount, interest rate, and estimated monthly payment. SUF ¶¶ 10, 13. After the first five conditional approvals expired, both Gary and Diana gave VMF permission to reactivate the loan and re-pull their credit. SUF ¶ 11. The monthly payment listed on the sixth conditional loan approval differed from the first by only $0.72. SUF ¶ 13. The pre-closing disclosure similarly contained all key terms of the loan. *Id.*

Months of repeated disclosures (both orally and in writing) and the related opportunities to inquire foreclose any finding that VMF deprived the Casdorphs of a meaningful opportunity to understand the transaction. There is no record evidence that VMF misrepresented a loan term, concealed a material fact, or used deceit to obtain assent.

### C. The Casdorphs' unconscionability claims cannot be based on allegations that CMH or the closing attorney's conduct was unlawful.

Otherwise, the Casdorphs' allegations of unconscionable conduct relate to the closing itself. Doc. 19, at ¶¶ 45–46, 48–49. But it is undisputed that no VMF representative was present at the closing. SUF ¶ 26. And as a result, the Casdorphs have largely focused on the conduct of CMH representatives and the closing attorney at their loan closing. Doc. 19, at ¶¶ 45–46, 48–49.

However, the Casdorphs have expressly disclaimed any reliance on CMH's conduct to establish VMF's liability. Doc. 30, at 9 n.9, 11 ("[T]he claims against [VMF] only concern the

loan financing transaction, not whether CMH's conduct was unlawful." (footnote omitted)).[8] The Casdorphs cannot now base their unconscionability claim against VMF on CMH's alleged misconduct. *See Tenneco Chemicals, Inc. v. William T. Burnett & Co.*, 691 F.2d 658, 664 (4th Cir. 1982) ("[J]udicial estoppel . . . prevents a party from asserting a position inconsistent with one previously asserted in the litigation where the change would prejudice the other party.").

Similarly, the Casdorphs cannot base their unconscionability claim on the conduct of the closing attorney Bernard Nibert and somehow impute that conduct to VMF. The Casdorphs allege that the closing process did not "afford [them] a reasonable opportunity to understand the parameters and terms of the transaction." Doc. 19, at ¶ 49. But VMF did not conduct the closing. SUF ¶ 26. To the extent their claim relies on the closing attorney's conduct, there is no "affirmative duty for a closing agent to explain the terms of a home loan and to ensure that the borrower understands the essential terms of the transaction." *Bennett v. Lending Sols. Inc.*, 2011 WL 4596973, at *11 (S.D.W. Va. Sept. 30, 2011).[9]

## II. VMF did not violate any provision of W. Va. Code § 31-17-8 (Count II).

### A. VMF did not misrepresent any closing fees (W. Va. Code § 31-17-8(m)(1)) nor did VMF did violate W. Va. Code § 31-17-8(j)(6).[10]

Section 31-17-8(m)(1) prohibits a lender from misrepresenting amounts paid to a third party. The Casdorphs allege that only $100 of the $412 attorney/closing fee was actually paid to the attorney. Doc. 19, at ¶ 28(c). The closing disclosure listed the closing/attorney fee as being paid to Title First, which it was. **Ex. 12**; SUF ¶ 24. VMF is not involved in the payment arrangement between Title First and the closing attorney, and it cannot be held liable for a violation

[8] After CMH was dismissed as a party, an arbitrator found for CMH. **Ex. 11**.
[9] Because the loan is not unconscionable, its terms—including the contractual jury trial waiver—are enforceable. **Ex. 1-R**, VMF-Casdorph_0000600. The Casdorphs thus waived their right to a jury trial for all remaining claims.
[10] Based on their Motion to Amend filed three (3) days ago, Doc. 66, VMF understands that the Casdorphs may no longer be pursuing these theories.

of subsection (m)(1) because it did not misrepresent the amount paid to Title First.

Section 31-17-8(j)(6) requires delivery of signed copies of the documents executed at closing. VMF indisputably provided Diana with a signed copy of all documents executed at the closing. The Amended Complaint admits this, Doc. 19, at ¶ 32, and the Casdorphs produced the email containing the signed documents, **Ex. 9**. The DocuSign expert confirmed. SUF ¶ 28. Moreover, Diana acknowledged that she possessed hard copies of all closing documents—meaning that Gary also had access to the closing documents. SUF ¶ 28.[11]

### B. Section 31-17-8(m)(5) does not prohibit a lender from taking a security interest in manufactured homes as personal property.

Section 31-17-8(m)(5) prohibits a lender from "[s]ecur[ing] a primary . . . mortgage loan by any security interest in personal property unless the personal property is affixed to the residential dwelling or real estate." The Casdorphs allege that VMF violated the statute because VMF has a security interest in the manufactured home, which remained personal property.

The Casdorphs' reading of subsection (m)(5) is untenable because it would render illegal all personal property lending in West Virginia for manufactured homes.[12] A "primary mortgage loan" is defined for purposes of subsection (m)(5) as "any loan primarily for personal, family, or household use that is secured by a mortgage, deed of trust *or other equivalent consensual security interest*, on a dwelling as defined" by TILA. W. Va. Code § 31-17-1(n) (emphasis added). TILA defines a "dwelling" as "a residential structure *or mobile home*." 15 U.S.C. § 1602(w) (emphasis added). Thus, primary mortgage loans are simply loans secured by a dwelling, including personal

[11] Additionally, TILA's disclosure requirements are generally satisfied when the disclosures are made "to any consumer who is primarily liable on the obligation." 12 C.F.R. § 1026.17(d); *see also* 12 C.F.R. § Pt. 1026, Supp. I, Part 2, 17(d)(2). Article 17 operates in alignment with federal disclosure rules. *Compare* W. Va. Code § 31-17-9, *with* 15 U.S.C. § 1638 and 12 C.F.R. § 1026.18.

[12] *See* **Ex. 19-A**, Courchane Report, at ¶ 61 (42% of manufactured-housing purchase loans are personal property chattel loans).

property loans for manufactured homes secured by the homes themselves.

As applied to subsection (m)(5), the Casdorphs' interpretation falls apart—the statute states that lenders cannot "[s]ecure a primary . . . mortgage loan by any security interest in personal property unless the personal property is affixed to the residential dwelling or real estate." W. Va. Code § 31-17-8(m)(5). Here, as defined by TILA, the manufactured home is the residential dwelling. Requiring the dwelling (as personal property) to be "affixed" to itself before it may secure its own loan is not a plausible reading. West Virginia courts "favor an otherwise reasonable construction of the statutory text over a more literal interpretation where the latter would produce a result demonstrably at odds with any conceivable legislative purpose." *In re D.K.*, 923 S.E.2d 425, 503 (W. Va. 2025) (citation modified). Subsection (m)(5) was intended to prevent lenders from taking a security interest in unrelated personal property like small appliances. It was not intended to prevent the lender from taking a security interest in the manufactured home that constitutes the financed dwelling. The only reasonable reading is that the subsection (m)(5) prohibits a security interest in unattached personal property that is not the dwelling.

**C. The Casdorphs have no evidence of a willful violation.**

For this Count, the Casdorphs solely seek equitable cancellation, *see* Doc. 19, at 15. That remedy requires proof of a willful violation. W. Va. Code § 31-17-17(a); *Quicken Loans, Inc. v. Brown*, 737 S.E.2d 640, 660 (W. Va. 2012). There is no evidence that VMF intended to violate § 31-17-8—and specifically here given the Casdorphs' outstanding claims, *see supra* n.10, VMF's interpretation of subsection 31-17-8(m)(5) is reasonable and precludes absurd results under the law. Without evidence of willfulness, the Casdorphs cannot obtain loan cancellation.

## III. The Casdorphs have no evidence that VMF committed fraud (Count III).

The Casdorphs assert fraud as a defense to the enforceability of the loan. Fraud requires

evidence of a "material and false" statement. *Lengyel v. Lint*, 280 S.E.2d 66, 69 (W. Va. 1981). Specifically, the Casdorphs claim that "the sale price of the mobile home was misrepresented and facts about the cost [of] the transaction and the model year of the home were suppressed." Doc. 19, at ¶ 57. This claim fails as a matter of law because VMF repeatedly and accurately disclosed the terms of the loan in the four-month period before closing—making at least *eight* such disclosures. SUF ¶¶ 9, 10, 13. The monthly payment listed in the pre-closing loan documents matched the amount listed on the final closing disclosure, accomplishing the transparency goals of TILA's mandatory disclosures. *See* SUF ¶¶ 13, 27. VMF did not misrepresent any facts about the loan transaction in its communications with the Casdorphs—just the opposite, VMF disclosed the loan's terms early and often. VMF is therefore entitled to summary judgment on Count III.

Otherwise, CMH—not VMF—communicated the manufactured home's sales price and model year to the Casdorphs. For the reasons set forth above, the Casdorphs cannot rely on the lawfulness of CMH's conduct to impose liability on VMF. *See supra* at I.C. At the onset of this litigation, VMF specifically raised the prospect of such vicarious liability. Doc. 23, at 2–3. But the Court expressly held that the Casdorphs' claims do not concern "whether CMH's conduct was unlawful." Doc. 30, at 11 (footnote omitted). Because the Court has already determined that this litigation does not concern CMH's conduct, VMF is entitled to summary judgment on Count III to the extent it is based on CMH's alleged misrepresentations.

## IV. The loan is a Qualified Mortgage entitled to a presumption of compliance with TILA's requirements, and the Casdorphs cannot rebut that presumption (Count IV).

The Casdorphs allege that VMF violated TILA's ability-to-repay requirement. Doc. 19, at ¶ 68; *see also* 15 U.S.C. § 1639c(a)(1); 12 C.F.R. § 1026.43(c)(1). Regulation Z provides a rebuttable presumption of compliance for a higher-priced covered transaction[13] when the loan

[13] There is no dispute that the Casdorphs' loan is a higher-priced transaction, which is "a covered transaction with an

satisfies the elements of a Qualified Mortgage. *See* 12 C.F.R. § 1026.43(e)(1)(ii)(A).

A Qualified Mortgage must be within the allowable APR spread, as adjusted for inflation. *Id.* § 1026.43(e)(2)(vi). The Casdorphs' loan satisfies this threshold. SUF ¶ 22.

A Qualified Mortgage must also satisfy five additional statutory elements. *First*, it must "provide[] for regular periodic payments that are substantially equal" that do not increase the principal balance, allow deferred principal payments, or result in a balloon payment. 12 C.F.R. § 1026.43(e)(2)(i). The Casdorph loan is a fixed-rate mortgage at 11.25% with a fixed principal and interest monthly payment of $1,209.45. SUF ¶ 20; **Ex. 12**. *Second*, the loan term must not exceed 30 years. 12 C.F.R. § 1026.43(e)(2)(ii). The Casdorph loan is a 25-year loan. SUF ¶ 20.

*Third*, the loan's points and fees cannot exceed statutory amounts. 12 C.F.R. § 1026.43(e)(2)(iii). Only the $3,186.68 origination fee is included in the points and fees calculation. *See id.* § 1026.32(b)(1)(i); 12 C.F.R. § 1026.4(a). The included points and fees for the Casdorphs' loan cannot exceed $3,730 for the loan to be a Qualified Mortgage. 12 C.F.R. § 1026.43(e)(3)(i)(B), (ii); 12 C.F.R. § Pt. 1026, Supp. I, Part 3, Para. 43(e)(3)(ii)(1)(ix)(B). The origination fee is less than this $3,730 cap. The rest of the closing fees are excluded from points and fees for the following reasons. *See* SUF ¶ 23 (referencing list of closing fees).

Closing fees for real-estate related charges[14] under 12 C.F.R. § 1026.4(c)(7) are excluded from points and fees because they satisfy the safe harbor in § 1026.32(b)(1)(iii): Each fee is reasonable, VMF received no compensation, and the payee is not a VMF affiliate. *See* SUF ¶¶ 24–25. The attorney/closing fee is excluded under § 1026.32(b)(1)(i)(D) as a bona fide third-party

---

annual percentage rate that exceeds the average prime offer rate for a comparable transaction as of the date the interest rate is set by 1.5 or more percentage points for a first-lien covered transaction." 12 C.F.R. § 1026.43(b)(4).

[14] This includes the appraisal fee paid to Nationwide Appraisal Network, LLC; the survey fee and survey placement fee paid to Gunnoe Surveying Mapping; the abstract of title fee, the document copies fee, the title insurance binder fee, and the title insurance endorsement fee paid to Title First Agency, Inc.; the document preparation fee paid to closing agent Lisa Balderson, Esq.; and the flood certification fee.

charge not retained by VMF and not otherwise required to be included under § 1026.32(b)(1)(ii)–(vi). *See* SUF ¶¶ 24–25. Recording fees and property taxes are not finance charges because taxes and fees prescribed by law that are paid to public officials to perfect a security interest are excluded under § 1026.4(e)(1).[15] The insurance premium is not a finance charge because VMF disclosed that coverage could be obtained from others and disclosed the premium. *See* § 1026.4(d)(2); SUF ¶ 23. Finally, the home protection plan is not a finance charge because VMF did not impose it as a condition of credit; it was an optional product. *See* § 1026.4(a); SUF ¶ 23.

*Fourth*, when underwriting the loan, the creditor must take into account the monthly payment for mortgage-related obligations. 12 C.F.R. § 1026.43(e)(2)(iv). VMF complied with this obligation. SUF ¶¶ 17, 19. *Fifth*, the creditor must consider the consumer's current or reasonably expected income, debt obligations, and monthly debt-to-income ratio or residual income using third-party records that provide reasonably reliable evidence of the consumer's income or assets. 12 C.F.R. § 1026.43(e)(2)(v). VMF complied with this obligation as well. SUF ¶¶ 16–19. All elements being satisfied, the Casdorphs' loan is a Qualified Mortgage.

To rebut the presumption, the Casdorphs must prove that, "at the time of consummation, based on the information available to" VMF, their monthly income and payment obligations "would leave [them] with insufficient residual income . . . with which to meet living expenses." 12 C.F.R. § Pt. 1026, Supp. I, Part 3, 43(e)(1)(ii)(1). The Casdorphs cannot make such a showing. Neither TILA nor Regulation Z require VMF to ask the Casdorphs about their individualized living expenses. *See* 15 U.S.C. § 1639c(a)(3); 12 C.F.R. § 1026.43(c)(2)(vii), (c)(7)(ii)(B). The residual income test requires lenders to consider only "remaining income after subtracting the consumer's total monthly debt obligations." 12 C.F.R. § 1026.43(c)(7)(ii)(B). VMF went above and beyond

[15] Even if they were treated as finance charges, they are bona fide third-party charges not retained by VMF or an affiliate of VMF and are excluded under 12 C.F.R. § 1026.32(b)(1)(i)(D). *See* SUF ¶¶ 24–25.

those requirements by specifically asking the Casdorphs about the categories of living expenses listed in the commentary. *See* SUF ¶ 2 & n.1.

"Based on the information available" to VMF "at the time of consummation," the Casdorphs had sufficient residual income to meet all their disclosed living expenses. The Casdorphs' net income was $5,671.32. SUF ¶ 16. After subtracting their monthly house payment and their other monthly debt obligations, their residual income was $2,579.06. That amount is more than sufficient to meet the living expenses reported by the Casdorphs. SUF ¶¶ 2, 6, 18.[16] The Casdorphs cannot rebut the Qualified Mortgage presumption because they had enough residual income to meet the living expenses reported to VMF.[17]

In the alternative—assuming the loan is not a Qualified Mortgage—VMF satisfied the ability-to-repay requirements as a matter of law. A creditor must consider eight factors in making a reasonable, good-faith repayment-ability determination.[18] The undisputed record evidence establishes that VMF considered each one. *See* SUF ¶¶ 16–19. Dr. Courchane confirmed that conclusion. **Ex. 19-A**, Courchane Report, at ¶¶ 92–96. TILA "does not dictate that [creditors] follow particular underwriting models." 78 Fed. Reg. 6408, 6408 (Jan. 30, 2013). "So long as

[16] In her deposition, Diana reported new monthly living expenses. VMF had no reason to know of these expenses at the time of consummation because the Casdorphs did not disclose them. **Ex. 4**, Diana Dep., at 133:16–134:11. That said, even assuming the reasonableness of such newly disclosed living expenses, the Casdorphs' residual income of $2,579.06 was sufficient. Diana also reported for the first time at her deposition a car payment for Gary in the amount of $700 per month. **Ex. 4**, Diana Dep., at 134:10–11. It is doubtful such a car payment existed at the time of loan consummation, as Diana confirmed just a few months later that hers was the only car payment. *See* SUF ¶ 7. Regardless, this information was not available to VMF at the time of consummation. The Casdorphs' credit reports did not show the loan, and the Casdorphs did not disclose it even when specifically asked about all monthly debt obligations. SUF ¶¶ 4, 7.

[17] The Casdorphs' residual income also exceeds the VA's guideline amounts for residual income. *See* 38 C.F.R. § 36.4340. Under the VA model, shelter expenses, defined by 38 C.F.R. § 36.4340(i), and other monthly debt obligations are subtracted from monthly income, and the resulting amount must exceed the VA's Table of Residual Incomes by Region, which requires minimum residual income of $889 per month for a family of three in the South region for loan amounts of $80,000 and above. *Id.* § 36.4340(e)(2). Even considering the Casdorphs' newly reported expenses, that VA threshold is satisfied.

[18] Specifically, a lender must consider the consumer's income and assets, employment status, monthly payments on the covered loan, monthly payments on any simultaneous loan on the same property, mortgage-related obligations, current debt obligations (including alimony and child support), debt-to-income ratio or residual income, and credit history. 12 C.F.R. § 1026.43(c)(2)(i)–(viii).

creditors consider the [enumerated] factors . . . according to the requirements" of the rule, they are "permitted to develop their own underwriting standards" and may "use [their] own definitions and other technical underwriting criteria." 12 C.F.R. Pt. 1026, Supp. I, Part 3, 43(c)(1)(1), 43(c)(2)(1). "Broad guidelines . . . provide creditors necessary flexibility to serve the whole of the mortgage market effectively and responsibly." 78 Fed. Reg. at 6470. Because VMF considered all eight ability-to-repay factors, it is entitled to summary judgment on Count IV.

**V. VMF did not conduct any unconscionable debt-collection activity (Count V).**

The Casdorphs allege that VMF engaged in unconscionable debt collection. Doc. 19, at ¶ 70; *see also* W. Va. Code § 46A-2-128. However, in support of this claim, the Casdorphs rely solely on VMF's placement of lender-placed insurance and its requirement to remove an existing structure from the property. **Ex. 4**, Diana Dep., at 148:23–150:15; **Ex. 5**, Gary Dep., at 25:4–26:1. VMF is entitled to summary judgment on this claim because those actions are not "debt collection."

Under "these sections of the WVCCPA there must be a debt, and a debt collector attempting to collect the debt." *Sigman v. Discover Bank*, 2017 WL 1345247, at *2 (W. Va. Apr. 7, 2017). Debt collection is "any action, conduct or practice of soliciting claims for collection or in the collection of claims owed or due or alleged to be owed or due by a consumer." W. Va. Code § 46A-2-122(c). "[A]ll activities occurring in connection with servicing a mortgage loan [are not] debt collection." *Spoor v. PHH Mortg. Corp.*, 2011 WL 883666, at *7 (N.D.W. Va. Mar. 11, 2011) (finding that the evaluation of a loan modification request was not debt collection).

VMF's placement of lender-placed insurance and its enforcement of the contractual requirement that an existing structure be removed from the property were not debt collection. Neither action "claim[ed] as due" or caused VMF to "receive payment for" the Casdorphs' debt. *Id.* (citation modified). The insurance notices asked the Casdorphs to provide proof of required

coverage and warned that VMF would place coverage if they did not, but they did not demand payment of an outstanding debt. SUF ¶ 30. Nor did VMF's enforcement of the structure-removal requirement seek money. Because the actions complained about by the Casdorphs were not debt collection, VMF is entitled to summary judgment on Count V.[19]

**VI. The E-SIGN Act claim fails as a matter of law (Count VI).**

The Casdorphs allege that the loan is unenforceable because VMF used electronic signatures for Gary "without his having demonstrated compliance with [the E-SIGN Act] and without his qualifying to enter into the agreement." Doc. 19, at ¶ 72. This claim fails as a matter of law because the E-SIGN Act does not create a private right of action. *See, e.g.*, *Levy-Tatum v. Navient & Sallie Mae Bank*, 2016 WL 75231, at *5 (E.D. Pa. Jan. 7, 2016).[20] The statute "contains no rights-creating language and manifests no intent to create either a private right or remedy." *Id.* The Casdorphs' claim under the E-SIGN Act therefore fails.

Even if the E-SIGN Act created a private right of action, section 7001(c) independently defeats the Casdorphs' claim. That provision states that the "legal effectiveness, validity, or enforceability of any contract executed by a consumer shall not be denied solely because of the failure to obtain electronic consent or confirmation of consent by that consumer." 15 U.S.C. § 7001(c)(3). The Casdorphs contend that, because the E-SIGN Act's consent requirements were not satisfied, the loan documents are "without force and effect." Doc. 19, at ¶ 73. That theory is foreclosed by the statute's plain language. *Levy-Tatum*, 2016 WL 75231, at *5. The Casdorphs "***signed at the closing***." SUF ¶ 27. They cannot use technicalities to revoke such assent.

---

[19] Even if either act qualified as debt collection, VMF did not act unconscionably. VMF informed the Casdorphs of the need to have property insurance and sent multiple notices for placing insurance on their behalf. SUF ¶¶ 23 & n.6, 30. Exercising an expressly disclosed right only after notice and an opportunity to comply is not unconscionable. Similarly, the Casdorphs were aware of their obligation to remove the existing structure as early as May 30, 2023. SUF ¶ 15. Diana assured VMF repeatedly that the existing structure would be removed. *Id.*

[20] *See also Hicks v. Cap. One Bank*, 2025 WL 958563, at *2 (D. Md. Mar. 31, 2025); *Stephens v. Bank of Am.*, 2017 WL 4322816, at *4 (E.D.N.C. Sept. 28, 2017); *Yoshimura v. Takahashi*, 446 F. Supp. 3d 644, 652 (D. Haw. 2020).

Respectfully submitted this 1st day of October, 2026.

_/s/ Carrie Goodwin Fenwick_
Carrie Goodwin Fenwick (WV Bar 7164)
GOODWIN & GOODWIN, LLP
300 Summers Street
Suite 1500
Charleston, West Virginia 25301
(304) 346-7000
cgf@goodwingoodwin.com

James C. Lester (Visiting Attorney ECF No. 33)
Nicolas H. Peck (Visiting Attorney ECF No. 34)
MAYNARD NEXSEN PC
1901 6th Ave. North
Suite 1700
Birmingham, Alabama 35203
(205) 254-1000
jlester@maynardnexsen.com
cpeck@maynardnexsen.com

*Attorneys for Vanderbilt Mortgage and Finance, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on October 1, 2026, I filed this document with the Clerk of Court via its electronic filing system.

*/s/ Carrie Goodwin Fenwick*
Carrie Goodwin Fenwick