**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**HUNTINGTON DIVISION**

| | |
|---|---|
| GARY W. CASDORPH and<br>DIANA L. CASDORPH,<br><br>PLAINTIFFS,<br><br>V.<br><br>VANDERBILT MORTGAGE & FINANCE, INC.,<br><br>DEFENDANT. | CASE NO. 3:25-CV-213 |

**VANDERBILT MORTGAGE AND FINANCE, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Carrie Goodwin Fenwick (WV Bar 7164)
GOODWIN & GOODWIN, LLP
300 Summers Street
Suite 1500
Charleston, West Virginia 25301
(304) 346-7000
cgf@goodwingoodwin.com

James C. Lester (Visiting Attorney ECF No. 33)
Nicolas H. Peck (Visiting Attorney ECF No. 34)
MAYNARD NEXSEN PC
1901 6th Ave. North
Suite 1700
Birmingham, Alabama 35203
(205) 254-1000
jlester@maynardnexsen.com
cpeck@maynardnexsen.com

*Attorneys for Vanderbilt Mortgage and Finance, Inc.*

The Casdorphs ask the Court to declare their loan illegal and Gary's signature void on two theories, both of which fail. First, they contend that W. Va. Code § 31-17-8(m)(5) forbids a lender from taking a security interest in the very manufactured home it finances. Their reading misquotes the statute, ignores its history, and would outlaw an entire category of manufactured-home lending that the legislature deliberately brought within Article 17's consumer protections. The statute targets security interests in unrelated personal property such as household goods—not the financed dwelling. And because VMF's reading is, at a minimum, reasonable, the Casdorphs cannot show the willful violation required for the cancellation remedy they seek.

Second, the Casdorphs seek judgment on Count VI, which pleads that Gary's electronic signature is ineffective because VMF did not satisfy the E-SIGN Act's consent requirements. That claim fails because the Act creates no private right of action and expressly provides that a contract may not be invalidated for lack of formal consent to conduct business electronically. Now purporting to disclaim the E-SIGN Act claim altogether, the Casdorphs attempt to substitute a new and far more serious accusation: that someone forged both of their signatures. That theory appears nowhere in their pleadings, and they cannot add it through a summary judgment brief.

Even if they could move for summary judgment on an unpled forgery claim, it would fail both as a matter of law and on the facts. No VMF representative attended the closing, so VMF could not have committed the alleged forgery. The electronic signing required each borrower's personal passcode, thereby ensuring that they completed the e-signature process. The independent closing attorney and the DocuSign audit trail confirm that the Casdorphs signed for themselves. Most significantly, just eight days after closing, Diana herself told VMF that "***we signed at the closing***." She later called her experience "really good," brought her sales agent homemade salsa as a thank-you, and made her first payment on time and in full. The Casdorphs' self-serving denials

cannot overcome the overwhelming factual record demonstrating their consent to the transaction, the statutory presumption of authenticity, or the clear-and-convincing standard that governs forgery. Their motion for partial summary judgment, Doc. 70, should be denied.

**OPPOSITION TO PLAINTIFFS' STATEMENT OF FACTS**

1. VMF originates loans for the purchase of manufactured homes. Doc. 67-1, at 2 ¶ 2.[1] On May 20, 2023, the Casdorphs visited a CMH Homes, Inc. ("CMH") retail home center in Barboursville. Doc. 67-5, at 24:2–16. Brandon Maynard, a CMH sales employee, assisted the Casdorphs in choosing a manufactured home. *Id.* Diana and Gary both signed a sales worksheet listing the sales price of the home. Doc. 67-14. Maynard assisted the Casdorphs in submitting a loan application to lenders, including VMF. Doc. 67-5, at 24:11–21, 25:11–20; Doc. 67-3 ¶ 3.

2. The Casdorphs speculate that the information in their May 20, 2023 credit application was pulled from their credit reports. *See* Doc. 70, at 2. But the application contains personal information that appears nowhere in the credit reports—including email addresses, length of residence, homeownership status, employment dates, hourly pay, bank accounts, land information, and contact information of their nearest relatives. *Compare* Doc. 67-1, at 9–14 (application), *with* Doc. 67-1, at 16–32 (credit reports). That information could only have come from the Casdorphs themselves, which confirms that they completed the application.

3. In completing the May 20, 2023 credit application, the Casdorphs also signed an agreement to transact business electronically. *See* Doc. 70-5. That was not their first such agreement. The Casdorphs submitted prior credit applications to VMF—applications they admit submitting and do not dispute signing—and with each one they signed an agreement to transact business electronically. *See* Doc. 67-5, at 18:22–19:13; **<u>Ex. 1-A</u>**. Each agreement provides that the

[1] The exhibits to VMF's Motion for Summary Judgment, Doc. 67-1 through Doc. 67-32, are incorporated herein and are referred to by their CM/ECF document number and page numbers.

Casdorphs may revoke their consent by notifying VMF, but none expires or is limited to a particular application. **Ex. 1-A**. The Casdorphs have never challenged the validity of these prior agreements and have offered no evidence that they ever revoked their consent.

4. Plaintiffs contend that Gary has a physical disability that prevents him from reviewing documents electronically and that VMF should have offered him an accommodation. But Plaintiffs admit they never requested such an accommodation. Doc. 67-5, at 185:12–15. Diana testified that she has no difficulty conducting business electronically, does so routinely, and that Gary relies on her to conduct business electronically for the household. *Id.* at 29:5–24.

5. On May 23, 2023, VMF's Todd Lewelling called Diana about the application the Casdorphs had submitted, identifying himself as calling from "Vanderbilt Mortgage & Finance." Doc. 67-23, at 3:6–18. Diana expressed no surprise that an application had been submitted—as she surely would have if, as Plaintiffs now contend, they never submitted one. *See id.* To the contrary, when Lewelling asked, "How are you doing today?" Diana replied, "Well, I would be a lot better if you would give me good news"—an unmistakable reference to her hope that the application would be approved. *Id.* Lewelling then offered the loan and orally disclosed all key loan terms: total sales price, amount financed, interest rate, and total monthly payment. *Id.* at 21:22–27:21. Diana asked Lewelling to slow down so she could write down the terms to tell Gary. *Id.* at 22:23–23:3, 18–21. Diana relayed the terms to Gary before closing. Doc. 67-5, at 74:12–15.

6. Plaintiffs assert that the "loan amount and monthly payment were uncertain from start to finish." Doc. 70, at 4. The record refutes that assertion. From the May 23, 2023 telephone offer through every subsequent written disclosure and the closing, the loan amount, interest rate, and monthly payment remained essentially constant, varying by only a few dollars. *See* Doc. 67-15; Doc. 67-2, at 55–74; Doc. 67-16; Doc. 67-13; **Ex. 1-B**. And the final loan amount and monthly

payment at closing were slightly *lower* than the figures Lewelling first quoted. *Id.*

| **Date of Disclosure** | **Loan Amount** | **Interest Rate** | **<u>Estimated Monthly Payment</u>** |
|---|---|---|---|
| May 23, 2023 (Phone Call) | $121,371 (rounded) | 11.25% | $1,377.50 (P&I: $1,211.57; Taxes: $77.53; Insurance: $88.40) |
| May 23, 2023 (Preliminary Loan Terms Sheet) | $121,370.39 | 11.25% | $1,377.50 (P&I: $1,211.57; Taxes & Insurance Combined: $165.93) |
| May 24, 2023 (Conditional Loan Approval) | $121,370.39 | 11.25% | $1,377.50 (P&I: $1,211.57; Taxes: $77.53; Insurance: $88.40) |
| June 2, 2023 (Revised Conditional Loan Approval) | $121,370.39 | 11.25% | $1,377.50 (P&I: $1,211.57; Taxes: $77.53; Insurance: $88.40) |
| June 14, 2023 (Revised Conditional Loan Approval) | $121,370.39 | 11.25% | $1,378.67 (P&I: $1,211.57; Taxes: $78.70; Insurance: $88.40) |
| June 30, 2023 (Revised Conditional Loan Approval) | $121,370.39 | 11.25% | $1,373.38 (P&I: $1,211.57; Taxes: $73.41; Insurance: $88.40) |
| September 14, 2023 (Revised Conditional Loan Approval) | $122,010.63 | 11.25% | $1,379.77 (P&I: $1,217.96; Taxes: $73.41; Insurance: $88.40) |
| September 25, 2023 (Revised Conditional Loan Approval) | $121,855.74 | 11.25% | $1,378.22 (P&I: $1,216.41; Taxes: $73.41; Insurance: $88.40) |
| September 25, 2023 (Pre-Closing Disclosure) | $121,157.88 | 11.25% | $1,371.26 (P&I: $1,209.45; Taxes & Insurance Combined: $161.81) |
| September 28, 2023 (Closing Disclosure) | $121,157.88 | 11.25% | $1,371.26 (P&I: $1,209.45; Taxes & Insurance Combined: $161.81) |

7. On September 20, 2023, the Casdorphs' conditional loan approvals expired. Doc. 67-2, at 55–74. VMF called the Casdorphs to obtain their permission to re-pull their credit reports, and both Diana and Gary agreed. Doc. 67-26, at 3:17–23, 7:3–10. Gary expressed no confusion about the fact that the Casdorphs were applying for a loan or about what he was being asked to authorize. *Id.* at 7:3–10. To the contrary, when VMF stated the need to re-pull credit and reactivate the loan, Gary asked "How long is that going to take?" *Id.* at 7:14–15.

8. On September 25, 2023, VMF sent the pre-closing disclosure to Diana through DocuSign at "graciesgrandma13@gmail.com," which Diana confirmed is her email address and one to which only she has access. Doc. 67-16; Doc. 67-5, at 115:10–13, 118:11–13. The DocuSign

envelope required the recipient to enter an access code before viewing or signing the documents. *See* Doc. 67-21, at 18, ¶ 41. The audit trail shows that Diana opened the envelope, successfully entered her access code, and viewed the documents at 1:48 p.m. and again at 1:57 p.m. *See id.* at 12, ¶ 28. She returned to the envelope at 2:29 p.m. and signed it at 2:30 p.m. *Id.* She then viewed the completed documents again at 3:12 p.m. and 5:50 p.m. *Id.*; *id.* at 13, ¶ 29. During that later review, Diana believed she had spotted a pricing discrepancy, and at 5:53 p.m. she texted CMH sales representative Brandon Maynard about it. Doc. 67-5, at 108:14–17; Doc. 67-11, at 3.[2]

9. The loan closed on September 28, 2023, at the Barboursville home center. Doc. 67-13. No VMF representative attended. Doc. 67-5, at 151:16–19, 152:15–20. The closing was conducted by Bernard Nibert, a licensed attorney retained by the title company. Doc. 67-32 ¶¶ 1, 4. Nibert is neither employed by nor affiliated with VMF. *Id.* ¶ 3. CMH employees Maynard and Travis Townsend also attended. Doc. 67-3 ¶ 8; Doc. 67-4 ¶ 2.[3]

10. Nibert presented documents for the Casdorphs to sign both on paper and electronically. Doc. 67-32 ¶¶ 5, 7. The electronic documents are displayed on a large flat-screen television mounted on the conference room wall. *Id.* To begin the electronic signing process, each borrower must enter a passcode. *Id.*; *see also* Doc. 67-21, at 15–16, ¶¶ 35–36. Nibert does not know the Casdorphs' passcodes or Social Security numbers, so he could not have initiated the electronic signing process on their behalf. Doc. 67-32 ¶ 9. Although Nibert is present throughout,

[2] Maynard explained to Diana that the quoted price did not include septic tank installation, which is not a standard installation service and which cost $12,000. Doc. 67-3 ¶¶ 5–6. Subtracting that $12,000 from the home's pre-tax sales price of $108,373.60 shows that the Casdorphs actually paid $96,373.60 for the home—*less* than the advertised sale price. *Id.* ¶ 7. Diana acknowledged that the Casdorphs never separately paid for the septic installation and that the septic cost could explain the perceived discrepancy. Doc. 67-5, at 109:17–110:7.

[3] Plaintiffs rely on an inoperative version of VMF's closing instructions to suggest that holding the closing at the home center where they bought their home was somehow improper. Plaintiffs contend that VMF's closing instructions "prohibit[ed]" closings at home centers. Doc. 70, at 6; *see also id.* at 5 n.5. But the version they cite is not the one that governed their closing. The operative closing instructions—which specifically reference the Casdorphs—contain no such prohibition. *See* **Ex. 1-C**. Plaintiffs' reliance on inoperative instructions is inappropriate.

the borrowers control the mouse and click to sign each document themselves. *Id.* ¶ 7. The Casdorphs completed their own electronic signatures. *Id.* ¶ 8.

11. As borrowers sign, Nibert explains the purpose of each document and certain of its terms, such as the total cost of credit. *Id.* ¶ 5. He answers the borrowers' questions and typically does about 75% of the talking at a closing. *Id.* The DocuSign audit trail shows that all three signatories to the electronic closing documents—Diana Casdorph, Gary Casdorph, and Travis Townsend—viewed and signed the documents from the same IP address. Doc. 67-21, at 18, ¶ 42.

12. Plaintiffs admit that Diana received an email containing the closing documents after the closing. Doc. 19 ¶ 32. The DocuSign audit trail confirms it. Doc. 67-21, at 17–18, ¶ 40. It further shows that Diana opened and viewed the completed closing documents on the evening of the closing, *id.* at 17–18, ¶¶ 39–40, using the same IP address she had used to sign the pre-closing disclosure, *id.* at 18–19, ¶¶ 42–43. In multiple phone calls, Diana stated that she had physical copies of the closing documents and later lost them. Doc. 67-27, at 6:5–8; Doc. 67-30, at 6:22–7:1; Doc. 67-31, at 4:19–22. Because Diana and Gary live in the same household, Gary likewise had access to physical copies of all closing documents until the Casdorphs lost them.

13. On October 6, 2023—eight days after the closing—Diana called VMF with a question: "What I'm needing to find out, I know they are escrowing the homeowners insurance into – into the loan. . . . ***[W]hen we signed at the closing***, they said we could change the homeowners at any time. And I am wondering what the process is to do that . . . ." Doc. 67-27, at 4:8–15 (emphasis added). Diana was describing the property insurance disclosure—an electronically signed closing document that says exactly what Diana recalled being told: "Borrower has the right to choose the person through whom the property insurance is obtained." Doc. 67-2, at 25. The wet-signed closing materials include no comparable document. Diana's

statement that "we signed at the closing" therefore refers to the electronically signed documents. The call also refutes Plaintiffs' contentions that a "discussion of terms never happened" and that the closing documents were "never provided to the Casdorphs for review." Doc. 70, at 4.

14. On October 26, 2023, VMF called Diana to review her loan details. Doc. 67-28, at 3:8–11. VMF explained the monthly payment. *Id.* at 4:15–6:5. When asked about her experience with VMF, Diana said that "it was really good." *Id.* at 4:13–14. She identified no problems with the closing. Doc. 67-5, at 129:6–15, 130:9–20. After the closing, Diana brought Maynard homemade salsa as a thank-you gift. *Id.* at 19:14–24, 129:16–130:8. On December 28, 2023, the Casdorphs made their first monthly payment—three days before it was due. *Id.* at 143:9–22.

## PROCEDURAL HISTORY

Before they moved for summary judgment, the Casdorphs never once claimed in their pleadings that someone other than themselves signed their closing documents. On January 31, 2025, they sent VMF a demand letter raising a number of grievances, including that they had been "induced" into the loan. *See* **Ex. 2**. The letter says nothing about forged signatures or about anyone other than the Casdorphs signing the loan documents. *Id.* On April 1, 2025, the Casdorphs filed their original Complaint. *See* Doc. 2. It, too, contains no allegation that the Casdorphs did not sign the closing documents. *Id.* On June 20, 2025, the Casdorphs filed the operative Amended Complaint. *See* Doc. 19. Its electronic-signature claim alleges only that VMF pursued an E-SIGN agreement with Gary "without his having demonstrated compliance with statutory requirements" of 15 U.S.C. § 7001(c)(1), and that the "transaction documents bearing his electronic signature are *therefore* forged and without force and effect." *Id.* ¶¶ 72–73 (emphasis added). In other words, the Amended Complaint alleges that Gary's electronic signature was legally deficient under the E-SIGN Act—not that the Casdorphs did not sign. *Id.*

Initially, Plaintiffs asserted claims against both VMF and CMH. Doc. 2. On June 19, 2025, CMH filed a motion to compel arbitration, Doc. 17, and VMF filed a motion to stay, Doc. 18. The next day, the Casdorphs filed their Amended Complaint, dropping CMH as a defendant but retaining all six claims for relief against VMF. Doc. 19. The Court denied CMH and VMF's motions. Doc. 30. The Court declined to compel arbitration between CMH and the Casdorphs because CMH was "no longer a party to [the] action, and the claims against [VMF] only concern the loan financing transaction, ***not whether CMH's conduct was unlawful***." Doc. 30, at 11 (footnote omitted, emphasis added). The Court reiterated that "[a]t this point, there simply are no claims against CMH." *Id.* CMH subsequently obtained an award from the AAA stating that CMH "engaged in no unconscionable actions in connection with the sale and closing," and "did not misrepresent or suppress any material facts to the Casdorphs." Doc. 67-12, at 7.

## STANDARD OF REVIEW

Summary judgment is only appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022).

## ARGUMENT

### I. W. Va. Code § 31-17-8(m)(5) does not render the Casdorphs' loan illegal.

The manufactured home that the Casdorphs purchased with their VMF loan is personal property, rather than real property. *See* Doc. 67-2, at 108–09. Title to the home is in the Casdorphs through a certificate of title issued by the West Virginia Department of Motor Vehicles, and the title reflects a duly-perfected lien in favor of VMF. Doc. 70-7. The Casdorphs argue that W. Va. Code § 31-17-8(m)(5) prohibits VMF from taking a security interest in their home. Doc. 70, at 9. VMF does not dispute that it has a security interest in the home, but that security interest does not

violate subsection (m)(5). At the outset, the Casdorphs' argument rests on an erroneous quotation of subsection (m)(5). They quote the subsection as prohibiting a lender from "secur[ing] a primary or subordinate mortgage loan by any security interest in personal property unless the personal property is affixed *to the real property that is securing the loan*." *Id.* (emphasis added). That is not what the statute says. The statute says a licensee may not make a primary mortgage loan[4] that is secured by "any security interest in personal property unless the personal property is affixed *to the residential dwelling or real estate*." W. Va. Code § 31-17-8(m)(5) (emphasis added). Stated differently, the "personal property" in which a security interest might be taken in violation of the statute must be something other than the "residential dwelling" in which the licensee's primary security interest is taken. Thus, the legislature's chosen language makes very clear that the statute prohibits lenders from securing a mortgage loan with security interests in personal property other than the "residential dwelling" itself—like small appliances, household goods, or furnishings.

Given the unmistakably plain language of the statute as applied in this case, it is unnecessary for the Court to address the Casdorphs' account of statutory amendment history and accompanying speculation as to legislative intent. But in any event, these arguments fail. The Casdorphs contend that subsection (m)(5), read together with subsection (m)(8), was "directed at the predatory practices of many lenders of taking security, both real and personal, well in excess of what was needed to cover the risk for the loan." Doc. 70, at 10. But subsection (m)(8) does not prohibit over-secured loans. Just the opposite. Under subsection (m)(8), a licensee may not make a loan "in a principal amount that . . . *exceeds* the fair market value of the property." W. Va. Code

[4] A "primary mortgage loan" is defined for purposes of subsection (m)(5) as "any loan primarily for personal, family, or household use that is secured by a mortgage, deed of trust or other equivalent consensual security interest, on a dwelling as defined" by TILA. W. Va. Code § 31-17-1(n). TILA defines a "dwelling" as "a residential structure *or mobile home*." 15 U.S.C. § 1602(w) (emphasis added). Homes built before 1976 are referred to as "mobile homes," while homes built after 1976 are referred to as "manufactured homes." *See Carr v. Michael Motors, Inc.*, 557 S.E.2d 294, 301 (W. Va. 2001). The Fourth Circuit has applied TILA's definition of a "dwelling" to manufactured homes. *See Heuer v. Forest Hill State Bank*, 894 F.2d 402 (table), 1990 WL 2319, at *1–2 (4th Cir. 1990).

§ 31-17-8(m)(8) (emphasis added). Subsection (m)(8) targets *under*-secured lending—loans whose balances exceed the collateral's value—not *over*-secured lending. The Casdorphs' assertion that VMF is "over-secured," Doc. 70, at 11, identifies no statutory violation; instead, it identifies a state of statutory compliance.

The legislature amended section 31-17-1 to expand the consumer protections in Article 17 for manufactured home purchasers. Prior to amendment, the 2000 version of Article 17 defined a primary mortgage loan as "a loan made to an individual which is secured in whole or in part by a primary mortgage or deed of trust upon any interest *in real property used as a residential dwelling* with accommodations for not more than four families." Doc. 70-12, at 2 (emphasis added). In the context of manufactured homes, at most, this definition of "primary mortgage loan" would have only applied to loans for manufactured homes legally affixed to real property under W. Va. Code § 17A-3-12b. The Casdorphs' loan is not such a "primary mortgage loan" as previously defined.

As amended, the definition of "primary mortgage loan" reads: "any loan primarily for personal, family, or household use that is secured by a mortgage, deed of trust or other equivalent consensual security interest, *on a dwelling* as defined in Section 103(w) of the Truth in Lending Act *or* residential real estate upon which is constructed, or intended to be constructed, a dwelling." W. Va. Code § 31-17-1(n) (emphasis added). This amended definition does include the Casdorphs' loan because it is secured by an "equivalent consensual security interest" on their manufactured home, which is a dwelling as defined by TILA. *See* 15 U.S.C. § 1602(w) (defining a "dwelling" as "a residential structure *or mobile home*" (emphasis added)).[5]

The definition of a "primary mortgage loan" now unquestionably applies to a loan secured

---

[5] *See also* 12 C.F.R. § 1026.2(19) ("Dwelling means a residential structure that contains one to four units, whether or not that structure is attached to real property. The term includes an individual condominium unit, cooperative unit, *mobile home*, and trailer, if it is used as a residence." (emphasis added)).

by a dwelling (the manufactured home) regardless of whether that dwelling is part of the real estate ("*or* residential real estate upon which is constructed, or intended to be constructed, a dwelling"), W. Va. Code § 31-17-1(n) (emphasis added). Subsection (m)(5) prohibits a "security interest in personal property unless the personal property is affixed *to the residential dwelling or real estate*." A "dwelling," defined by TILA to include a manufactured home as personal property, cannot be affixed to itself. So, under the Casdorphs' reading of subsection (m)(5), unless the manufactured home is affixed to real estate, a loan secured by that manufactured home is per se illegal. The clear intent of the legislature was to bring manufactured home loans within the ambit of Article 17 even if they are not legally affixed to real estate.[6] But if the Casdorphs' preferred interpretation of subsection (m)(5) is accepted, it would make those same loans illegal. The Casdorphs offer no support for this untenable result. That remarkable interpretation, if correct, would mean that VMF, other manufactured home lenders, and secondary market participants including Fannie Mae and Freddie Mac have all misunderstood the governing framework for years. Loans for manufactured homes not affixed to real estate are ubiquitous. Doc. 67-20, at 23–24, ¶¶ 61–62.

The expansion of consumer protections accomplished by broadening the definition of a "primary mortgage loan" to include manufactured home loans was not meant to alter the application of subsection (m)(5), which was not amended. The purpose of subsection (m)(5) remained as it has always been—to prevent lenders from taking a security interest in personal property other than the residential dwelling purchased with the loan, meaning household goods, appliances, furnishings, and the like. West Virginia courts "favor an otherwise reasonable construction of the statutory text over a more literal interpretation where the latter would produce

[6] The Casdorphs suggest the amended definition matters only "for purposes of licensing." Doc. 70, at 12. But this ignores the plain reading of the statutory language: the definition of "primary mortgage loan" is not limited to licensing—it applies to Article 17 as a whole, including subsection (m)(5). W. Va. Code § 31-17-1.

a result demonstrably at odds with any conceivable legislative purpose." *In re D.K.*, 923 S.E.2d 425, 503 (W. Va. 2025) (citation modified). The only reasonable reading is that personal property in subsection (m)(5) refers to personal property other than the residential dwelling. Alternatively, where the personal property is the residential dwelling, it shares a legal identity for purposes of affixation and already satisfies subsection (m)(5). VMF, not the Casdorphs, is entitled to summary judgment on this claim.

In any event, because VMF's reading of subsection (m)(5) is reasonable and avoids absurd results, the Casdorphs cannot establish the willful violation required for the only remedy they seek—cancellation of the loan. *See* W. Va. Code § 31-17-17(a); *Quicken Loans, Inc. v. Brown*, 737 S.E.2d 640, 660 (W. Va. 2012); Doc. 19, at 14–15.

## II. Plaintiffs' E-SIGN Act claim fails, Plaintiffs cannot replead in briefing, and their unpled "forgery" claim would also fail.

Count VI of the Amended Complaint pleads a single theory: that Gary's electronic signature is invalid because VMF did not satisfy the consumer-consent provisions of the federal E-SIGN Act. Doc. 19, at 18. That claim fails as a matter of law, as VMF demonstrated in its own summary judgment motion. Recognizing as much, Plaintiffs now purport to disclaim reliance on the E-SIGN Act and instead suggest, for the first time, that someone forged both Casdorphs' electronic signatures. The Court should reject that maneuver for the following reasons.

### A. Plaintiffs' pleaded E-SIGN Act claim fails as a matter of law.

Count VI, as pleaded, centers on E-SIGN Act compliance and nothing else. The Amended Complaint devotes multiple paragraphs to quoting and paraphrasing the Act's consumer-consent requirements, Doc. 19 ¶¶ 12–14, and then alleges that Gary did not meet those requirements, *id.* ¶ 15. Count VI itself alleges that VMF "pursued an E-sign agreement with the Plaintiff Gary Casdorph without his having demonstrated compliance with statutory requirements and without

his qualifying to enter into the agreement, *all in violation of* 15 U.S.C. 7001(c)(1)." *Id.* ¶ 72 (emphasis added). Because of that statutory violation, Gary alleges, the "transaction documents bearing his electronic signature are *therefore* forged and without force and effect." *Id.* ¶ 73 (emphasis added). The word "forged" describes the asserted legal consequence of non-compliance with the E-SIGN Act—not a factual allegation that someone other than Gary affixed his signature.

Count VI does not even mention Diana. Nowhere does the Amended Complaint allege that she did not sign the closing documents. To the contrary, it alleges that, after the closing, Diana "received an email with the nineteen closing documents." Doc. 19 ¶ 32. And it complains that the Casdorphs "did not leave with a signed copy of all documents executed at closing," *id.* ¶ 33—an allegation that presupposes the documents were signed and "executed at closing."

The pleaded claim fails for two independent reasons. *First*, the E-SIGN Act does not create a private right of action. *See Levy-Tatum v. Navient & Sallie Mae Bank*, 2016 WL 75231, at *5 (E.D. Pa. Jan. 7, 2016).[7] *Second*, even if a private right of action existed, the Act itself defeats Plaintiffs' theory. It provides that the "legal effectiveness, validity, or enforceability of any contract executed by a consumer shall not be denied solely because of the failure to obtain electronic consent or confirmation of consent by that consumer." 15 U.S.C. § 7001(c)(3). Plaintiffs' claim—that the loan documents are "without force and effect" because Gary's consent did not satisfy § 7001(c)(1), Doc. 19 ¶¶ 72–73—asks the Court to do precisely what § 7001(c)(3) forbids. *See Levy-Tatum*, 2016 WL 75231, at *5.

A signatory is bound by the agreements he executes: "The fact that the plaintiffs may have signed a document without reading it first does not excuse them from the binding effect of the agreements contained in the executed document." *Chaney v. Tri State Food Sys., Inc.*, 2020 WL

[7] *See also Hicks v. Cap. One Bank*, 2025 WL 958563, at *2 (D. Md. Mar. 31, 2025); *Stephens v. Bank of Am.*, 2017 WL 4322816, at *4 (E.D.N.C. Sept. 28, 2017); *Yoshimura v. Takahashi*, 446 F. Supp. 3d 644, 652 (D. Haw. 2020).

2615755, at *1 (S.D.W. Va. May 22, 2020) (Chambers, J.) (citation modified). Plaintiffs contend that Gary "cannot read documents on a computer screen." Doc. 70, at 2, 6. But the burden of overcoming this claimed disability is on the signatory. In *Chaney*, the plaintiff sought to avoid an agreement because of her dyslexia and learning disability. 2020 WL 2615755, at *1. This Court rejected that argument, explaining that the duty to read a contract "has been extended to cases where the person who signs the contract is illiterate; in such cases, the individual has a responsibility to have the contract read to him." *Id.* (citation modified). Because the plaintiff did not "assert she ever asked for the document to be read to her or have it explained to her before she signed it," she "executed the document at her own peril and [was] not excused from its binding effect." *Id.* Here, Plaintiffs never asked VMF, or anyone else, for an accommodation at closing. *See* Opp. SOF ¶ 4. Gary cannot now invoke his disability to escape the loan. Count VI fails as a matter of law, and the Court should deny Plaintiffs' motion and grant VMF's. *See* Doc. 68, at 21.

**B. Plaintiffs cannot amend their complaint in a brief.**

Perhaps recognizing that their pleaded claim cannot survive, Plaintiffs now pivot, insisting that they "do not assert a cause of action under the federal or state E-sign Acts." Doc. 70, at 13.

Plaintiffs' new claim remains unclear even from their own motion. They appear to be recasting Count VI as a fraud-by-forgery claim[8]—asserting that neither Casdorph signed any electronic document at closing and that someone, never identified, "affixed" their signatures for them. *See* Doc. 70, at 13–17. That theory is irreconcilable with the Amended Complaint. *See supra* at 12–13. Moreover, if Plaintiffs truly believed that neither of them signed, both would have asserted a forgery claim, yet Count VI is brought on Gary's behalf alone. Doc. 19 ¶¶ 71–74.

---

[8] While West Virginia does not recognize "forgery" as a freestanding civil claim, courts often treat such claims as "fraud by forgery" or treat forgery as a "species" of fraud. *See, e.g.*, *Carter v. Mortg. Elec. Registration Sys., Inc.*, 680 F. App'x 178, 180 n.5 (4th Cir. 2017); *Piedra v. Vanover*, 174 A.D.2d 191, 193–94 (N.Y. App. Div. 1992).

Whatever their new claim is, the Court cannot entertain it. The Fourth Circuit has held that "a plaintiff may not raise new claims after discovery has begun without amending his complaint," and a party may not use summary judgment briefing to amend. *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir. 2009); *see also Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 946 (4th Cir. 2013). This Court has rejected a theory first raised at summary judgment that "could not have been the subject of discovery" on the defendant's part, because "asserting it at this late stage constitutes unfair prejudice." *Living Lands, LLC v. Cline*, 657 F. Supp. 3d 831, 845–46 (S.D.W. Va. 2023) (Chambers, J.). The rule equally applies when the new theory is in the plaintiff's *own* motion. *See, e.g.*, *In re Enova Textiles, LLC*, 2026 WL 3029935, at *3–5 & n.4 (Bankr. M.D.N.C. Oct. 8, 2026); *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008).

Here, discovery was conducted on the claim Plaintiffs pleaded—an E-SIGN Act challenge to Gary's consent—not on an accusation that an unidentified person forged both borrowers' signatures. *See Harris*, 523 F. App'x at 946–47. And Plaintiffs offer no explanation for raising this explosive accusation only now. If anyone had forged their signatures, the Casdorphs would have known it on the night of the closing, when Diana opened the emailed documents bearing their electronic signatures. *See supra* Opp. SOF ¶ 12. Yet the theory appears nowhere in their demand letter, their original Complaint, or their Amended Complaint. *See supra* at 7–8. Because Plaintiffs cannot present a forgery claim at trial, they certainly are not entitled to summary judgment on it.[9]

### C. VMF cannot be liable for any alleged forgery.

Even if Plaintiffs could assert a new claim that someone applied their signatures without

[9] Nor may Plaintiffs proceed on the theory by consent. A case may not proceed to trial on "an unpleaded theory of recovery" without both "parties' express or implied consent," *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 401 (4th Cir. 1999), and a court "will not imply consent to try a claim merely because evidence relevant to a properly pleaded issue incidentally tends to establish an unpleaded claim," *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986). VMF does not consent to trial of any forgery claim, and it expressly objects to Plaintiffs' attempt to inject one.

their consent, there is absolutely no record evidence supporting any such claim against VMF. A fraud-by-forgery claim, *see supra* n.8, lies against the person who committed the fraud. *Martin v. ERA Goodfellow Agency, Inc.*, 423 S.E.2d 379, 381 (W. Va. 1992) (holding one of the "essential elements in an action for fraud" is "that the act of fraud was committed by the defendant").

The undisputed evidence establishes that no VMF employee was present at the closing where the Casdorphs signed the loan documents. Opp. SOF ¶ 9. As Plaintiffs acknowledge, *see* Doc. 70, at 6, the DocuSign audit trail shows that all three signatories signed from the same IP address, meaning all three were on the same network at the same location. Opp. SOF ¶ 11. The electronic signatures were therefore applied by someone at the closing—almost certainly the Casdorphs themselves—but certainly not VMF who was not present. Opp. SOF ¶ 9.

To the extent Plaintiffs seek to hold VMF responsible for the conduct of CMH's employees at the closing, they are estopped from doing so. Plaintiffs dropped CMH and secured this Court's ruling that their claims "only concern the loan financing transaction, not whether CMH's conduct was unlawful." Doc. 30, at 11. Judicial estoppel "prevents a party from asserting a position inconsistent with one previously asserted in the litigation where the change would prejudice the other party." *Tenneco Chems., Inc. v. William T. Burnett & Co.*, 691 F.2d 658, 664 (4th Cir. 1982); *see also* Doc. 68, at 11–12. Moreover, CMH obtained a final award establishing that "CMH engaged in no unconscionable or improper conduct prior to or at the closing," a finding that necessarily encompasses, and therefore precludes, Plaintiffs' new forgery allegations. *See* Doc. 67-12, at 6. In any event, there is no evidence that VMF directed any CMH conduct at this loan closing.

Likewise, to the extent Plaintiffs suggest that the closing attorney, Bernard Nibert, forged their signatures, VMF cannot be liable for his conduct. Nibert was retained by the title company and is neither employed by nor affiliated with VMF. Opp. SOF ¶ 9. As VMF has explained,

Plaintiffs cannot impute the closing attorney's conduct to VMF. Doc. 68, at 12. Notably, VMF's closing instructions expressly require that borrowers sign for themselves. *See* **Ex. 1-C**. Accordingly, VMF cannot be held liable on any forgery theory.

**D. Plaintiffs' forgery theory fails on the undisputed record.**

Plaintiffs also claim that the burden rests upon VMF to prove that the Casdorphs' signatures are authentic and authorized. *See* Doc. 70, at 13 (asserting that "Defendant must establish that each purported signature was that person's act"). West Virginia law states precisely the opposite.

It is *Plaintiffs* who bear a heavy burden of proof. Forgery must be proven by clear and convincing evidence. *Lease v. Brown*, 473 S.E.2d 906, 908–09 (W. Va. 1996). And when the validity of a signature is challenged, "the signature is presumed to be authentic and authorized." W. Va. Code § 46-3-308. Self-serving denials cannot carry that burden. "A mere assertion that one does not recall signing a document does not, by itself, create an issue of fact as to whether a signature on a document is valid—especially in the absence of any evidence the document was fabricated." *State ex rel. Troy Grp., Inc. v. Sims*, 852 S.E.2d 270, 278 (W. Va. 2020) (citation modified). A party's refusal to acknowledge an electronic signature, "made without the support of a shred of evidence that might cast doubt on the authenticity" of the signed record, does not raise a genuine dispute. *Id.* at 280 n.6 (quoting *Perez v. Ruby Tuesday*, *Inc.*, 2019 WL 355637, at *4 (N.D.N.Y. Jan. 28, 2019)).[10] If the Court permits Plaintiffs to proceed on this theory, they bear the burden of proving it. Summary judgment in Plaintiffs' favor is plainly unwarranted; indeed, the record forecloses their claims as a matter of law.

Plaintiffs' contention that the electronic closing had no "security procedures" to ensure the

[10] *See also Hurtt v. Del Frisco's Rest. Grp.*, 2019 WL 2516763, at *3–6 (Del. Super. Ct. June 18, 2019) (suspicions and inconsistent testimony are not "competent proof" that a party did not sign); *Rush Truck Ctrs. of Tex., L.P. v. Mendoza*, 676 S.W.3d 821, 829 (Tex. App. 2023) ("merely denying an electronic signature" is not evidence of invalidity (citation modified)).

person signing was the borrower, Doc. 70, at 14–17, is unsupported and demonstrably false. Each Casdorph had to enter a personal access code to begin the electronic signing process, and each did so successfully. Opp. SOF ¶¶ 10–11. Plaintiffs' own authorities show that such a procedure can defeat a forgery claim as a matter of law. In *Lewis v. Navient Solutions*, *Inc.*, the cosigner's electronic signature was accepted only after an authentication process requiring him to input personal information, including his Social Security number. 2015 WL 10936762, at *1 (W.D. Mo. Jan. 22, 2015), *aff'd*, 618 F. App'x 301 (8th Cir. 2015). The court held that "no reasonable factfinder could find that Plaintiff had not e-signed himself," because the record contained no "indication, beyond Plaintiff's assertion," of forgery. *Id.* at *4. Likewise, in *Employee Resource Group, LLC v. Collins*, the court rejected a party's claim that the electronic signature was not hers because "the only way the digital signature appears on the document was for [her] to have entered her password." 2019 WL 2338500, at *5–6 (W. Va. June 3, 2019). The same is true here: the electronic signing could not begin without each Casdorph's passcode. Opp. SOF ¶ 10.

Nibert, a licensed attorney with no affiliation to VMF, directly contradicts the Casdorphs' characterization of the closing. He testified that the borrowers control the mouse and click to sign each electronic document themselves, and he does not know the borrowers' passcodes and so could not have begun the signing process for them. Opp. SOF ¶ 10. The uncontested DocuSign audit trail corroborates Nibert's account. It shows a gap of approximately ten minutes between Diana's inputting her passcode to open the electronic package and her completion of the signing process. *See* Doc. 67-21, at 15, ¶ 35.[11] That gap makes no sense if someone were secretly forging the Casdorphs' signatures, but it aligns precisely with Nibert's testimony that he explained the loan documents as the Casdorphs clicked through them. The Casdorphs' conduct after the closing

[11] Gary, who was in the same room and heard the same explanations, then completed his own signing more quickly, as did Townsend. *See* Doc. 67-21, at 15–16, ¶¶ 36–37.

confirms that they knew exactly what they had signed. The audit trail shows that, within hours of the closing, Diana opened and reviewed the very documents Plaintiffs now say were forged. Opp. SOF ¶ 12. Plaintiffs admit she received them by email. Doc. 19 ¶ 32. And in multiple calls with VMF, Diana said she had physical copies of the closing documents. Opp. SOF ¶ 12.

Diana's own statements eight days after the closing also refute the forgery theory. She called VMF and said: "***when we signed at the closing***, they said we could change the homeowners at any time." Opp. SOF ¶ 13. The context makes clear she was referring to an electronically signed document. *Id.* Diana's contemporaneous admission that "we signed" the document, and that its terms were explained to her, cannot be squared with her statement years later that she never saw any documentation. Doc. 67-5, at 102:10–14, 110:5–10. On October 26, 2023, VMF called Diana to review her loan. When asked about her experience, she said it was "really good," and she identified no problem with the closing or with anyone at VMF. Opp. SOF ¶ 14. She later brought Maynard homemade salsa as a thank-you gift. *Id*. On that same call, VMF reviewed her monthly payment—the same amount stated in the closing documents and in the pre-closing disclosure—and Diana acknowledged it without objection or question. *Id.*; *see id.* ¶ 6. The Casdorphs then paid that amount, on time and in full. *Id.* ¶ 14. Borrowers who believed their signatures had been forged do not behave this way. *Cf. Lewis*, 2015 WL 10936762, at *4 (correspondence and contacts about the loan "indicate knowledge and ratification of the Loan agreement, even if Plaintiff himself did not type his own electronic signature"); *Martin*, 423 S.E.2d at 381–82 (holding that party who "accept[s] the performance of the party who committed the fraud . . . thereby waives any subsequent action for fraud").

Moreover, after the Casdorphs began asserting claims against VMF, they never mentioned forgery. *See supra* at 7–8. They offer no explanation for why an accusation this serious, the facts

of which they would have known on the night of the closing, surfaced for the first time in their summary judgment motion. At base, this new forgery theory rests entirely on the Casdorphs' deposition testimony, but that testimony has proven unreliable. At deposition, Diana testified: "We did not get copies of anything. We did not get e-mails of the ones that were done on the closing date." Doc. 67-5, at 133:7–9. When shown an email from her own production, she claimed not to remember it and speculated that it may have been planted because "[p]eople hack people's accounts all the time." *Id*. at 119:5–6. The DocuSign records prove her testimony false: she reviewed the emailed documents the night of the closing, Opp. SOF ¶ 12, and later forwarded them to Plaintiffs' counsel, *see* **Ex. 3**. Because Diana's testimony on this point was demonstrably false, Plaintiffs ultimately had to abandon their claim alleging non-receipt of closing documents. *See* Doc. 66-1 ¶¶ 52–56 (abandoning W. Va. Code § 31-17-8(j)(6) claim). The unreliability of self-serving testimony is precisely why West Virginia law presumes a challenged signature authentic, W. Va. Code § 46-3-308, requires proof of forgery by clear and convincing evidence, *Lease*, 473 S.E.2d at 908–09, and holds that a bare denial of signing does not create a genuine dispute of authenticity, *Troy Grp.*, 852 S.E.2d at 278.

Finally, Plaintiffs' suggestion that electronic signing "seemed designed to facilitate fraud or, at the very least, suppression of the significant monetary terms of a transaction" makes no sense. Doc. 70, at 20. For months before the closing, VMF disclosed the transaction's monetary terms on nearly a dozen occasions—each stating terms essentially the same as, or slightly higher than, the final terms. Opp. SOF ¶ 6. Three days before closing, VMF sent a pre-closing disclosure with the same monthly payment that appeared in the final closing disclosure. *Id.* A lender determined to conceal terms does not disclose them repeatedly and accurately in advance. Plaintiff's motion for partial summary judgment, Doc. 70, should be denied.

Respectfully submitted this 15th day of October, 2026.

*/s/ Carrie Goodwin Fenwick*
Carrie Goodwin Fenwick (WV Bar 7164)
GOODWIN & GOODWIN, LLP
300 Summers Street
Suite 1500
Charleston, West Virginia 25301
(304) 346-7000
cgf@goodwingoodwin.com

James C. Lester (Visiting Attorney ECF No. 33)
Nicolas H. Peck (Visiting Attorney ECF No. 34)
MAYNARD NEXSEN PC
1901 6th Ave. North
Suite 1700
Birmingham, Alabama 35203
(205) 254-1000
jlester@maynardnexsen.com
cpeck@maynardnexsen.com

*Attorneys for Vanderbilt Mortgage and Finance, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on October 15, 2026, I filed this document with the Clerk of Court via its electronic filing system.

*/s/ Carrie Goodwin Fenwick*
Carrie Goodwin Fenwick