**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**GARY W. CASDORPH and**
**DIANA L. CASDORPH,**
**Plaintiffs**

**v.** **Civil Action No. 3:25-cv-213**

**VANDERBILT MORTGAGE & FINANCE, INC.**
**Defendants.**

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs seek equitable loan relief against Vanderbilt to save their real property and have a home. Plaintiffs have moved for summary judgment on their Count II claim for illegal security interest and their Count VI claim for excluding Gary Casdorph from all involvement in loan origination. Defendant seeks summary judgment on all claims, the remaining four of which involve major disputes of fact. Therefore, Defendant's motion should be denied in full.

**Defendant's financing procedure**,[1] through which the Casdorphs were processed, involves: (1) upon a prospect's contact with a Clayton Home Center ("HC"), facilitate VMF's electronic credit application form from the prospective consumer(s) with little inquiry of expenses or liabilities; (2) obtain their electronic signatures on an authorization to do business electronically, often without their knowledge or computer capability; (3) apply VMF's unrealistic residual income guidelines ($1 remaining after limited household expense review) without detailed inquiry and using unrealistically low estimates; (4) approve financing for purchase at that one Clayton HC, (5) secure substantial cash downpayment or real property for easy liquidation, then (6) direct closing

1 Witnesses will rebut any denial by VMF of its protocol of using electronic signature closings when consumers are present, orchestrated through the HC manager to suppress contract terms. *See* Compl. of Jason Riffle Ex. 1 (suppressed $40,000 added to amount financed), and Decl. of Christoopher Brogan Ex. 2 (suppressed $30,000 added to price).

orchestrated through the HC using electronic signatures to avoid a complete law office procedure (*i.e.* title search through meaningful document presentation and hand signature).

**Clayton's Vertical Integration**. The vertically integrated Clayton entity engages in the manufacturing, transportation, sales, and financing of mobile homes nationwide out of its campus headquarters in Maryville, Tennessee. Dozens of affiliate companies nationwide (involving those four activities) have their headquarters there. The significant portion of Clayton's consumer financing is accomplished through Defendant from headquarters, originated through its sales lots throughout the country but headquartered in Maryville.[2] Vanderbilt's role is to facilitate financings of the Clayton product and other Clayton HC financings. With a cash downpayment and/or real/personal property security, it is protected against loss. High interest rates, more typical of unsecured loans since the 2008 crash than of mortgage loans, are charged to vulnerable consumers. It matters little to Clayton whether the consumer can pay since the product is moved, any downpayment banked, and the security can be quickly liquidated if needed.[3] The consumer's loss of home is not a loss to Vanderbilt or Clayton.

**Core Legal Issues**. The Count I unconscionability claim and the Count IV TILA Ability to Repay claim describe the core of the case - Vanderbilt placed the Casdorphs in a facially unaffordable financing loan (with high interest rate, though fully secured) resulting in inevitable, immediate default. The origination process disregarded major living expenses and liabilities,

2 Clayton has an estimated 75-90% of the West Virginia mobile home retail market operating through its variously named HC's acquired in the last 20 years.
3 *E.g.*, Clayton income is greater with (i) the sale of foreclosed real property ($20-$30K), HC resale of retaken mobile home, and retention of high rate monthly payments (whether, for example, three at $1400, or three years of the same payment $50,400), than with (ii) receiving payments to term of $900/month on the same principal financed at a reasonable rate. Hence the exploitive, real property secured mortgage rate of 11% rather than a 7% rate, for example.

subjecting Plaintiffs to the likelihood of imminent foreclosure on their real property, all designed to promote Clayton's product-moving goals.[4]

**Lack of any Experience with Mortgages.** Plaintiffs Gary and Diana Casdorph are very unsophisticated in mortgage financing, Gary being employed as a union cement finisher. Neither one had ever before participated in a home mortgage. *See* G. Casdorph Dep., June 30, 2026, Ex. 3; D. Casdorph Dep. 75:13-15; 154:17-155:3, June 30, 2026, Ex. 4. Neither Diana or Gary Casdorph have any understanding of the concepts of rates or interest.[5] *See* Diana Dep. 75:13-15; 154:17. Gary Casdorph has a core understanding of what his household can afford in terms of monthly payments and was firm in the origination process in declaring $800 to be the maximum monthly payment that the household is capable of in any given context. *See* Gary Dep. 12:12-13; 12:18-19; errata 12:19; 23:24-24:3. Diana had no comprehension of the financial impact of contract terms – after she made clear their payment range $700, maximum $800, couldn't afford $1000 (and underwriter recorded notation "Red flag_- $700 payment) (Dep. Diana 165:16 -167:24; 43:1-4), in the same conversation, she orally responded with 28 "okays" to other possible terms (Dep. Diana C. 65:14-67:3). It became the uniform practice of VMF to communicate only with (and record) her, but without meaningful inquiry into liabilities and expenses.

**The Casdorph's Financing Inquiry/Application**. Prior to the May 20, 2023, application initiated at the Barboursville Clayton HC, Plaintiffs had applications submitted electronically from other Charleston area HC's beginning in 2022. In a December 2022 application, VMF used the

4 The Count VI claim of excluding Gary from the transaction (and the Count III Contract Defense of Fraud) includes the suppression of essential terms from him, a part of the procedural unconscionability). The Count V Illegal debt collection claim, also involving significant questions of fact, is also one element of the substantive unconscionability in the Defendant's insistence on a transaction term that was unnecessary, except to the extent that it made the loan more unaffordable. *See* Discussion Count V*, infra.*

5 Gary Casdorph doesn't read beyond a kindergarten level, his speech impediment having hindered his education but not his intellectual functioning; he relies on written documents being placed in front of him accompanied by oral explanations, not computers which he can't use, to conduct his business affairs. *See* Gary Dep. 19; 24:4-11; Diana Dep. 74:2-21; 27:11-12; 27:16-22.

standard URLA Form 1003, which had plenty of space for liabilities (2c), liabilities and expenses (2d), apparently prepared by the same VMF underwriter. *See* Ex. 5. All information for evaluating debts and expenses were blank[6] and even section 3 for real property owned was left blank, something the Casdorphs would never do if involved.

On Saturday, May 20, 2023, Plaintiffs visited the Clayton HC in Barboursville, for the first time ever. Agent Maynard stated that "our first thing was to go in here and see what you qualify for" and from the other side of the desk got on his computer and asked them for names, addresses and two forms of ID; they provided drivers' licenses and social security cards. *See* Gary Dep. 23; Diana Dep. 23: 11-15;155-56.[7]

On this occasion, the agent did not use the URLA 1003 but VMF's form. The form does not contain the sections for liabilities (2c) or liabilities and expenses (2d); it has only tiny space on the last page for "Debts and Other Information" (with two questions and *no inquiry or spaces for listing of outstanding debt obligations*). *See* Def. Ex.1-A.[8] For "monthly household expenses" the Vanderbilt form contains a tiny space (less than an inch) for five very general categories, not

---

6

**2c. Liabilities - Credit Cards, Other Debts, and Leases that You Owe** ☐ *Does not apply*

**List all liabilities below (except real estate) and include deferred payments. Under Account Type, choose from the types listed here:**
• Revolving *(e.g., credit cards)* • Installment *(e.g., car, student, personal loans)* • Open 30-Day *(balance paid monthly)* • Lease *(not real estate)* • Other

| Account Type - *use list above* | Company Name | Account Number | Unpaid Balance | *To be paid off at or before closing* | Monthly Payment |
|---|---|---|---|---|---|
| | | | $ 0.00 | ☐ | $ 0.00 |
| | | | $ 0.00 | ☐ | $ 0.00 |
| | | | $ 0.00 | ☐ | $ 0.00 |
| | | | $ 0.00 | ☐ | $ 0.00 |
| | | | $ | ☐ | $ |

**2d. Other Liabilities and Expenses** ☐ *Does not apply*

| Include all other liabilities and expenses below. Choose from the types listed here: • Alimony • Child Support • Separate Maintenance • Job Related Expenses • Other | Monthly Payment |
|---|---|
| Alimony / Child Support | $ 0.00 |
| Job Related Expense / Separate Maintenance | $ 0.00 |
| | $ |

7 Given Mr. Casdorph's physical limitations, he could not, and knowing his limitations would not, have attempted an electronic credit application, or agreed to conduct the purchase of the mobile home electronically - he cannot not decipher documents on a computer screen, and does not, and could not, access a computer or make use of any of the other devices listed. *See* Gary Dep.19; Diana Dep. 24:3-8.

8

**MONTHLY HOUSEHOLD LIVING EXPENSES**

INSTRUCTIONS: Please fill out the MONTHLY HOUSEHOLD living expenses below such as food, clothing, gasoline, health care, (including the payment of recurring medical expenses), and repayments to a 401(k) loan.

Food: $ 200.00 Clothing: $ 0.00 Gasoline: $ 80.00 Health Care: $ 25.00 (Including payment of recurring medical expenses) 401(k) Loan Repayments: $ 0.00

**DEBTS AND OTHER INFORMATION**

Where will the home be located? Street Address: 200 Joseph road City: St albans State (Required): WV Zip Code: 25177

If home will be located on a rented property/park/community, amount of future monthly lot rent/site rent: $ 0.00

broken out in any way or to be itemized by whoever filled it in, *and does not contain any space for the ten most common household living/utility expenses*.[9]

There was no discussion whatsoever on this day (or any other day) about, or even mention of, conducting business electronically. *See* Gary Dep. 16:2-13; 18:14-19:12; 21:21-22:4; Diana 155:21-24. Neither Diana nor Gary Casdorph knew that someone was creating bogus documents declaring that the Casdorphs had gone through the procedures required by state and federal law to consent to conduct all business electronically.[10]

**The Casdorphs' Financial Means.** The Casdorphs are (and were in 2023) hand to mouth every month. A quick review of their monthly expenses at the time makes clear that there was no way they could add an additional $1371/month to their monthly expenses and not default.

They had average monthly utility expenses at that time totaling $1170: electric $400, water $40, trash $33, septic $33, cable internet $325; cell phones for three $350. And as to Vanderbilt's five categories they actually had a total of $1400: food (at home only) $300,[11] Gary's work clothing $300, Gasoline $400, Healthcare not including medications $400. In addition, there was indebtedness for Diana's car payment, $702, and Gary's monthly truck payment, $700.[12]

---

9 A credit application was being prepared on a computer apparently accessing credit reports; their cell numbers in the application were incorrect. *See* Diana Dep. 31:20- 32:3. No accommodation was provided Gary. *See* Gary Dep. 17:15-21. Gary never saw the application or had knowledge of what went into it. *See* Gary Dep.18:2-6;11-13; Diana 24:9-10.

10 Typically, in a WVCCPA case there are two document productions, the *first* one being in response to the prefiling, statutory request for comprehensive transaction documents with the Notice of Right to Cure, and the *second* being responsive to the Rule 34 Request in the case. Generally, these two document productions of the transaction documents are very similar as to transaction documents. Here, however, in the first, a 685 page, prefiling production of the transaction documents (March 19, 2025),was an ostensible E-sign consent *document labelled with the name of Barboursville HC Townsend* (the Vanderbilt loan *closer here)* with Casdorphs' names on it, but obviously *backdated more than a year prior to their first ever appearance at the HC.* *See* Notice, attached as Ex. 6. In the second, the Rule 34 Response in this action, ten months later (January 28, 2026), that document disappeared and was replaced by a "Consent to Conduct Business Electronically" document dated May 20, 2023, containing ostensible electronic signatures of both Casdorphs, another document about which they had no knowledge. *See* Consent, attached as Ex. 7.

11 He worked(s) at many locations a distance from home (both employers), necessarily involving other food costs.

12 Defendant's lack of inquiry as to liabilities, has led to its not knowing of Gary's truck payment $700/mo., *see* Ex. 8, receipts for the 2023 payments to United Bank, a monthly payment for which he has to this day.

The omissions are glaring. There was apparently no inquiry into the household's utility bills. The application makes no inquiry for electric, water, phone, gas, sewer, internet, vehicle insurance, vehicle taxes nor was there any underwriting inquiry; Vanderbilt doesn't consider vehicle insurance or vehicle taxes as a household expense. *See* Dep. Lewellyn 25-33; Def's. Ex 7. There was no meaningful underwriting inquiry to the Casdorphs about vehicle payments nor did the 2023 form allow space for that listing. It is incredible underwriting would allow without followup in the critical residual income determination the facially unbelievable, listed monthly expenses of: $0 in clothing, $25 for health, and $200 in food for a three-person household (whether the estimate was provided by a Casdorph or by Maynard). *See* n.8*, supra.*

**Vanderbilt's Underwriting Procedures.** The credit application had no space for a detailed listing of liabilities and hence did not consider a number of Casdorph debts. Vanderbilt does not do any meaningful inquiry into the household's actual living expenses – rather it uses a grossly inadequate "estimate" as a part of its determination of residual income. The application of a $100 estimate for <u>all</u> monthly utilities is facially absurd. The average electric bill *alone* for those living in a singlewide mobile homes in West Virginia is in the hundreds. It did not ask for or consider actual electric bills, water bill, septic expense, refuse expense, telephone/cell expenses, internet/cable expenses. And Vanderbilt does not, for example, consider the cost of car insurance or vehicle property taxes. Dep. Moore, Def. Ex.6:17, Lewellyn Def. Ex. 7:25-33.

In underwriting a loan application for singlewide purchase, for living expenses Vanderbilt relies on (1) the higher of (i) the total of the five general estimates (unqueried) on the agent-submitted application (here $400) or (ii) $495 ($425 + $70) as the total monthly living expenses; then (2) it adds $100 for monthly utility expenses. *See* Dep. Moore, Def. Ex. 6, Def. Mot.S.J 11-15. This is Vanderbilt's Guideline for <u>TOTAL household monthly living expenses and utilities:</u>

$595 ($495 + $100 (for two)) in the Casdorph's case. Compare this to the actual $2570, the total from: (1) the five category estimates of $300 Food at home, Gary's clothing $300, Gasoline $400, Health care excluding medication $400 (the four of which total $1400), and (2) utility costs which would have been available to Vanderbilt upon inquiry ($1170). *See* Diana C. Dep. Ex 3. This is Vanderbilt's "underwriting of monthly household expenses and utility costs."[13]

**PreClosing**. On or about September 25, 2023, Defendant Vanderbilt forwarded electronically the requisite early Closing Disclosure to Plaintiff Diana Casdorph, who uses email and received it, (and she did receive by email *after* the closing, the documents supposedly signed at closing). The documents indicated that the Closing was scheduled for September 28, 2023. She texted Maynard about the discrepancy in the price hoping it would be resolved at closing. The loan amount and monthly payment were uncertain from start to finish. Gary was emphatic that they would not agree to pay more than $800 per month, *see* Gary Dep. 12:12-19, but VMF did not communicate with him. Diana had early on expressed a $700/month range (marked as a red flag by underwriter), said $1000 was out of their range (Dep. Diana 165-67). The final discussion of terms never happened.[14]

**The Casdorph Closing.** The areas of agreement (or lacking any factual disagreement) are: (1) the closing was conducted at the HC on September 28, 2023, and all parties were present; (2) the HC manager separated the documents into piles for hand signature and for electronic signature;

13 Vanderbilt also did not consider many factors affecting the Casdorph household income, including but not limited to, the time-limited nature of Diana Casdorph's employment as a care-giver for someone in failing health, how Gary Casdorph's handicap affected his income prospects, or geographical variations in living expenses. The seasonal nature of employment is to be considered, it was not in Gary's case even though Vanderbilt claims that as a factor (Dep. Moore, *supra*, 18-19).

14 The documents with the loan terms—Consumer Note and Security Agreement (*see* Ex. 3, Dep. Ex. 17) and final Closing Disclosure (*see* Ex. 3, Dep. Ex. 16)—were in "pile three," the documents that the closer never provided to the Casdorphs for review.

(3) the notarized (pen & ink) documents were signed first;[15] (4) major transaction documents with the financing terms (including Note, Closing Disclosure, TIL ATR Disclosure) later had electronic signatures attached (by someone) and were not presented for hand signing; (5) no written copies of the electronically signed documents were placed in front of Gary; (6) the HC manager had a role in the closing; (7) the location of each of the participants at the table, except for Nibert who was standing; and (8) no copies of closing documents were transmitted to Gary following closing- after the closing, the electronic closing documents were forwarded to Diana. *See* Gary Dep.20-21; 23:1 errata, 23:1-17; 18:1 errata; Diana Dep. 74-75; Townsend Decl. Def. 3; Nibert Decl. Def. 31; Maynard Decl. Def. 2.

There are major issues of fact created by the lawyer-written declarations: (1) the notary/attorney declaration contradicts the Casdorphs' testimony that he said very little and left after the wet-signature notarizations, *see* Def. 31;[16] (2) the Maynard and Townsend declarations which indicated that Townsend explained documents, that the closing was "overseen" by Nibert, that an electronic screen was activated. *See* Def. 2 & 3.[17]

Both spouses vigorously deny signing any documents electronically that day. Mr. Casdorph denies ever being able to review electronic disclosures or signing any document electronically. *See* Gary Dep. 20:21--23:114; Diana Dep. 74:2--75:21. The spouses' experiences with electronic documents differed. Though there was no discussion or authorization to conduct business electronically, Diana can and did use email by receiving and responding, implicitly consenting to

---

15 "And as soon as we got doing stack two, and signed off for the notary, then he quietly left. Didn't say a word the whole time." *See* Diana Dep. 111:15; 110:9-12; nor speak to Gary. *See* Diana 156:8-11.

16 In prefiling interview on March 28, 2025, at 11:33 AM, Nibert stated that he had no memory of the Casdorph closing, that his normal procedure in his many Vanderbilt closings at that location is to leave after the notarized documents leaving the dealer to deal with the electronic signature documents, since his is only paid $100 to do this limited role. This is consistent with the Casdorph's testimony that he left after the notarized documents.

17 Townsend has already demonstrated his capacity to participate in creation of bogus documents. See n.7*, supra*.

*receive* documents electronically. Indeed, after receiving the preclosing documents, she objected to their terms. *See* Vanderbilt Forwarding of Preclosing Document, *infra*. She does deny electronically signing the closing documents. Gary testified that he did not electronically sign the documents (written copies of the pile three documents were not provided and even if Townsend had turned on the screen he cannot read in that format). Defendant relies on DocuSign records to prove the validity of the spouses' signatures. Their expert reports that the closing envelopes for both spouses were sent to, viewed by someone at, and signed at the same IP address as the envelope sent to closing agent Travis Townsend. *See* Docusign Expert Rpt. ¶¶ 45, 46, 48.

Critical transaction details were not presented, let alone the expected professional explanation of payment and other loan terms. (Ex 3.; Dep16). Had Gary known at the time that these were the final terms, he would not have proceeded with the transaction: "If I had oral explanation of them, I never would have bought the home." (Dep. Gary C: errata 23:12 & 23:1-17.) After the Plaintiffs left the closing, Plaintiff Diana Casdorph received an email with the nineteen closing documents she was not afforded the opportunity to understand at closing. Plaintiff Gary Casdorph received nothing by email; this is not disputed. *See* Dep. Gary C: errata 18:1 ("They have not sent me one document since the beginning in May.").

## DISCUSSION

## LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if a reasonably jury "could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and should only be granted "where the record as a whole could not lead a rational trier of fact to find for the non-

movant." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (all facts and inferences most favorable to nonmoving party).

## I. THE UNCONSCIONABILITY OF THE CONTRACT IS MANIFESTED IN ITS TERMS AND ITS INDUCEMENT

The Count I issue of whether a loan is unconscionable and/or induced by unconscionable conduct is a question of law for the Court following mandated factual presentation. The law requires that "the parties shall be afforded a reasonable opportunity to present evidence as to its setting, purpose, and effect to aid the court in making the determination." W. Va. Code §46A-2-121(2). Upon that basis, the claim is seldom even a subject of summary judgment determination.

The Court has before it evidence of the vast disparity of the parties in economic circumstances, the exclusion of Gary Casdorph effectively from involvement in the transaction, the high rate and unaffordable terms, the meaningless use of the residual income standard when the lender makes no real effort to learn of household expenses and liabilities. But the Court has not as yet heard (i) the *compelling* testimony of Gary, who is, for example, very firm that there is to be no loan if the payment exceeds $800/month, (ii) observed Diana's lack of financial sophistication, which made her an easy target for Clayton's churning mill so long as Gary was excluded, (iii) heard any cross of the Defendant's lawyer-prepared declarations contradicting actual testimony, (iv) heard evidence of the commercial setting, (v) heard from the parties' experts, or (vi) had the opportunity to weigh the credibility of witnesses whose credibility is already at issue from facially bogus documentation.

Both West Virginia common law and statutory law provide for a defense to a contract that is (i) unconscionable in terms or (ii) unconscionably induced. *See* W. Va. Code § 46A-2-121.[18] The

---

18 The doctrine of unconscionability is a common law concept supported by a century and a half of West Virginia jurisprudence (and imported into various statutory contexts). *See e.g., Herrod v. 1st Republic Mortg. Corp., Inc.,* 625 S.E.2d 373, 379 (W. Va. 2005) ("The drafters of the Uniform Consumer Credit Code explained that the principle of

substantive unconscionability inquiry "focus[es] on the relative positions of the parties, the adequacy of the bargaining position, and the existence of meaningful alternatives available to the plaintiffs." *Hager v. American Gen. Fin., Inc.,* 37 F. Supp. 2d 778, 786 (S.D.W. Va. 1999) (citing *Art's Flower Shop, Inc. v. Chesapeake & Potomac Tel. Co.,* 413 S.E.2d 670, 675 (W. Va. 1991)). A court looks to both procedure and substance. *Id.*; *see also Troy Min. Corp. v. Itmann Coal Corp.,* 346 S.E.2d 749, 753 (W. Va. 1986). This District has repeatedly applied the unconscionability defense in mortgage loan cases. *See, e.g., Knapp v. Am. Gen. Finance Inc.,*111 F. Supp.2d 758, 764-65 (S.D.W. Va. 2000) (denying summary judgment on unconscionability claim); *Hager*, 37 F. Supp. 2d at 778-86; *Kline v. Wilmington Fin., Inc.,* No. 2:09-cv-1082, 2010 WL 2698792, at *6 (S.D.W. Va. July 7, 2010) (denying motion to dismiss unconscionability claim); *Ross v. Wells Fargo Bank, N.A.*, No. 3:08-1452, 2009 WL 357921 (S.D.W. Va. Feb. 12, 2009) (denying Wells Fargo's motion to dismiss unconscionability claim).[19]

A claim of unconscionability requires both procedural and substantive allegations of unfairness.

---

unconscionability 'is one of the prevention of oppression and unfair surprise and not the disturbance of reasonable allocation of risks or reasonable advantage because of superior bargaining power or position.'"); *Zirkle v. Winkler,* 585 S.E.2d 19, 23 n.5 (W. Va. 2003) (noting certain "[e]xculpatory provisions in a contract of adhesion...are unconscionable."); Lang v. Derr, 569 S.E.2d 778, 783 (W. Va. 2002) ("[T]he court concludes that the contract was, in fact, unconscionable under the law of West Virginia" and therefore unenforceable); *Duncan v. Duncan*, 140 S.E.2d 689, Syl. Pt. (W. Va. 1927) ("Equity will not exercise its discretionary authority to decree specific execution of a contract . . . where it would be oppression and unfair surprise and not the disturbance of reasonable allocation of risks or reasonable advantage because of superior bargaining power or position.'"); *Gray v. Baltimore Bldg. & Loan Ass'n,* 37 S.E. 533, 536 (W. Va. 1900); *Engeman v. Taylor,* 33 S.E. 922, 940 (W. Va. 1899); *Knight v. Watts' Adm'rs*, 26 W.Va. 175, 1885 WL 2527 (W. Va. 1885); *Ludington v. Renick*, 7 W.Va. 273, 1874 WL 3182 (W. Va. 1874); *Davis v. Henry,* 4 W.Va. 571, 1874 WL 2759 (W. Va. 1871); *Brakely v. Tuttle,* 3 W.Va. 86, 1868 WL 1582 (W. Va. 1868).

19 There is a substantial body of West Virginia case law regarding unconscionability in the home purchase and financing context in the last forty years. *E.g., Quicken Loans, Inc. v. Brown*, 230 W.Va. 306, 322, 737 S.E.2d 640, 656 (2012) (citations omitted). **Error! Main Document Only.**Courts "focus on the relative positions of the parties, the adequacy of the bargaining position, and the existence of meaningful alternatives available to the plaintiffs." *Hager v. Am. Gen. Fin., Inc.*, 37 F. Supp. 2d 778, 786 (S.D.W. Va. 1999) (citing *Art's Flower Shop, Inc. v. Chesapeake & Potomac Tel. Co.*, 413 S.E.2d 670, 675 (W. Va. 1991)). "Whether a particular term in a contract is unconscionable often depends on the circumstances in which the contract was executed or the fairness of the contract as a whole, and therefore [the] analysis necessarily includes an inquiry beyond the face of the contract.*" Koontz v. Wells Fargo Bank, N.A.,* 2011 WL 1297519, at *4 (S.D.W. Va. Mar. 31, 2011) (quoting *Troy Mining Corp. v. Itmann Coal Co.*, 346 S.E.2d 749, 753 (W. Va. 1986)).

> Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract. Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction.

Syl. Pt. 10, *Brown v. Genesis Healthcare Corp.*, 229 W. Va. 382, 386, 729 S.E.2d 217, 221 (2012); *see also Herrod v. First Republic Mortg. Corp.*, 218 W. Va. 611, 616, 625 S.E.2d 373, 378 (2005). "Courts should apply a 'sliding scale' in making this determination: the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the clause is unenforceable, and vice versa." Syl. Pt. 9, *Brown*, 229 W. Va. at 386, 729 S.E.2d at 221.

> In assessing substantive unconscionability, courts must consider whether a contract term is one-sided and will have an overly harsh effect on the disadvantaged party. The factors to be weighed in assessing substantive unconscionability vary with the content of the agreement. Generally, courts should consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and public policy concerns.

*Id*. at Syl. Pt. 12.

All of this will be a part of the factual presentation at trial on this core issue. The substantive unconscionability will focus, *inter alia*, on the underwriting standards and ignoring of many factors, the lack of any real examination of liabilities, the lack of real review of household expenses, the actual lack of any concern for ability to pay in the context of a fully secured loan at the high rate, placing vulnerable consumers in loan at an exploitive rate when a reasonable rate could have made it affordable. The procedural unconscionability will include evidence on use of the standard VMF protocol articulated above to originate loans and the elements thereof, the effective exclusion of Gary from transaction involvement with his firm position on affordability, the creation of bogus documents, the use of electronic signing with consumers present as a means

of suppression of contract terms. It's a wonder that the Casdorphs were able to get the second month without defaulting on the exploitive financing:

> VMF's underwriting standards are recklessly weak. Their requirement for only $1 of residual income is particularly unjustified because the purpose of residual income is to act as a buffer for the types of unanticipated financial difficulties that all borrowers experience at one time or another. One dollar is clearly not an adequate buffer. In this case, the Casdorphs had less than ten dollars of residual income, based on their true expenses. That is functionally the same as not having any residual income. VMF is able to use such weak underwriting standards because it charges such high rates of interest and because it is over-secured. That is the definition of an exploitive mortgage loan. In the event of default, VMF can not only sell the Casdorphs' land, but it can also repossess their manufactured home and resell it . . .

Pizor Rebuttal Rpt. Ex. 9, 4-5. The Federal CFPB in its investigation prior to filing to enforce the prohibition of lending without the ability to pay (Arg. IV, *infra*) determined:

- Vanderbilt developed and relied on a residual income model as a core of its underwriting
- The living expenses Vanderbilt uses in its model are borrower's unverified or Vanderbilt's own estimates, which are unreasonable and ignore geographical variations
- The living expense estimates are about half of the average self-reported expenses, and the loan underwriting allowed approval of borrowers' loans who did not have the ability to repay
- Vanderbilt originated loans even where borrowers lacked assets (other than the value of the property securing the loan) that could be relied upon for repayment.

*See* CFPB *v. Vanderbilt Mortgage & Finance Inc.,* (E.D. Tenn. Jan. 2025) ¶¶17-21.[20]

---

20 The federal Consumer Financial Protection Bureau brought a nationwide suit to stop the Defendant's financing without the ability to pay (CFPB v. Vanderbilt M & F, Inc., NO. 2:25-cv-00004 E.D. Tenn.) upon a wide range of complaints on this singular issue of unaffordability. "The CFPB alleges that Vanderbilt failed to make reasonable, good-faith determinations of borrowers' ability to repay loans, as legally required. Specifically, the lawsuit alleged Vanderbilt:

▪ **Manipulated lending standards when borrowers did not make sufficient income:** In its underwriting process, Vanderbilt often disregarded evidence that borrowers did not have sufficient income or assets (other than the value of their home) to pay their mortgage and cover recurring obligations and basic living expenses, like food and health care. Sometimes, Vanderbilt originated loans for borrowers who were already struggling, making their financial situation worse. For example, Vanderbilt approved a loan for a family with 33 debts in collection and two young children. The borrowers fell behind only eight months after getting the mortgage.

▪ **Fabricated unrealistic estimates of living expenses:** Vanderbilt justified its determination that borrowers could pay the loans by using artificially low estimates of living expenses that made no adjustment for higher expenses in different geographic areas. Vanderbilt's estimated living expenses were about half of the average of self-reported living expenses for other, similar, Vanderbilt loan applicants. These families were left with little or no buffer to cover

## II. THE PROHIBITION OF PERSONAL PROPERTY SECURITY INTERESTS IN THE CONTEXT OF RESIDENTIAL MORTGAGE LOANS SECURED BY REAL ESTATE IN W.VA.CODE §31-17-8(m)(5) IS CLEAR ON ITS FACE

Plaintiffs have set forth in detail their argument in support of summary judgment on liability on this Count II claim in their Motion for Partial Summary Judgment.[21] The Defendant argues an interpretation that would render the legislative prohibition virtually meaningless.

Defendant argues that the clear language reading "falls apart" and without any citation whatsoever makes a confusing argument that the section "was intended to prevent lenders from taking security interests in unrelated personal property like small appliances." *See* Def.'s Mem. SJ at 14. What is Defendant referring to . . . toasters, dehumidifiers? This is a novel argument![22] The Article's three-prong definition reads:

> (n) "Primary mortgage loan" means
> - any loan primarily for personal, family, or household use
> - that is secured by a mortgage, deed of trust or other equivalent consensual security interest
> - on a dwelling as defined in Section 103(w) of the Truth in Lending Act *or residential real estate upon which is constructed, or intended to be constructed, a dwelling;*

---

unexpected expenses. For example, Vanderbilt left one family of five with only $57.78 in net income after Vanderbilt applied its estimate of living expenses. That family first missed a payment only a year after signing the mortgage.

- **Made loans to borrowers it projected could not pay:** In some cases, Vanderbilt violated its own policy and made loans to borrowers who, even under the company's overly optimistic estimates, did not have enough income to cover the mortgage and basic living expenses. For example, Vanderbilt approved a mortgage for a single mother with two dependents after estimating she had insufficient income, and then sent her loan to collections when she missed a mortgage payment after only four months in the home.

The CFPB alleges that Vanderbilt violated the Truth in Lending Act and Regulation Z. When Vanderbilt originated loans to borrowers who lacked sufficient income (or assets beyond the home) to make the payments on the loan, Vanderbilt set those families up for failure." See CFPB announcement and filed civil action at consumerfinance.gov.wayback.archive-it.org/23481/20250225014003. The action was dismissed later in 2025 when the new administration shut down all enforcement.

21 In their Second Amended Complaint the Plaintiffs abandoned their *claim for relief in Count II* (but not the fact of their occurrence) for the other two violations of the W. Va. Residential Mortgage Lender, Broker & Servicer Act, inasmuch as this one violation can involve no dispute of fact. Plaintiff does not abandon the fact of occurrence of these elements as a part of the unconscionability. For example, the Defendant does not claim that Gary C. received copies of closing documents at the closing. These issues are still be a part of the unconscionability and Count VI determinations.

22 This argument has never been put forth by any of the West Virginia lawyers in defense of the same claim against VMF in other resolved cases.

W. Va. Code §31-17-1(n). The post-Dodd-Frank amendment to the definition simply added the TIL defined "dwelling" into the definition to permit state licensing of mobile home loan originators. Defendant, in attempting to make its confusing argument, deleted from its quotation of the Article's definition the last clause reading "or residential real estate upon which is constructed, or intended to be constructed, a dwelling." *See* Def.'s Mem. SJ at 12.

But applying the entire three-part definition quoted above to the Casdorph context, the section 8(m)(5) mortgage loan prohibits a *second* (personal property) security interest in a real estate secured loan (*i.e.* in the loan note and/or as a lien on title), in the context of (1) a loan primarily for personal, family, or household use, (2) that is secured by a deed of trust on (3) residential real estate on which is intended to be constructed a dwelling. There is little question that these three criteria are met in the Casdorph case.

Defendant makes the additional bizarre argument that this plain reading of the statute would make all personal property secured loans illegal. But in personal property secured loans, since there is no security interest in real property to which a mobile home could be affixed and the dwelling itself is personal property, this section 8(m)(5) provision designed to prevent multiple security interests is treated by regulators as having no applicability to the context of personal property secured loans. *See e.g.,* Brogan financing Ex .2. The plain language and intent of the 2000 statute prohibiting <u>multiple</u> security interests in mobile home transactions in real property contexts is clear on its face.[23]

23 The Defendant seemingly acknowledges the violation in thereafter seeking a factual determination of lack of willfulness for its violation of the prohibition, correctly pointing out that to obtain cancellation of the loan (*i.e.* Voiding of the entirety of the loan*, as opposed to any equitable relief short of 100%*), requires proof of willfulness to violate the prohibition. W.Va. Code §31-17-17(a) (affording a range of damage and equitable relief); *Quicken Loans, Inc. v. Brown*, 737 S.E.2d 640, 660 (W. Va. 2012). Willfulness is a determination for the jury, but would only arise if the Court contemplated 100% cancellation rather than, for example, an eighty percent reduction of principal. Evidence, including prior cases against Defendant on this claim resolved but without changing the practice, will be adduced.

## III. FRAUDULENT SUPPRESSION AS A CONTRACT DEFENSE INVOLVES QUESTIONS OF FACT

The elements of Plaintiff's contract defense of fraud are as follows:

> (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it.

*Lengyel v. Lint*, 167 W. Va. 272, 276–77, 280 S.E.2d 66, 69 (1981) (quoting *Horton v. Tyree*, 104 W.Va. 238, 242, 139 S.E. 737 (1927)). "Fraudulent concealment involves the concealment of facts by one with knowledge or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud." *Knapp v. Americredit Fin. Servs., Inc.*, 245 F. Supp. 2d 841, 852 (S.D.W. Va. 2003) (citing *Trafalgar House Const., Inc. v. ZMM, Inc.*, 211 W. Va. 578, 584, 567 S.E.2d 294, 300 (2002); *Teter v. Old Colony Co.*, 190 W. Va. 711, 717–18, 441 S.E.2d 728, 734–35 (1994). Fraud as a contract defense in the context of suppression of mortgage terms is very appropriate defense:

> Concealment, and in some cases non-disclosure of a fact are equivalent to such an assertion. A misrepresentation may have three distinct effects . . .. First, in rare cases, it may prevent the formation of any contract at all. Second, it may make a contract voidable. Third, it may be the grounds for a decree reforming the contract . . .

*Herrod v. First Republic Mortg. Corp., Inc.*, 218 W. Va. 611, 626, 625 S.E. 2d 373, 388 (2005) (Starcher, J. concurring); *see also Matney v. Blakely*, 97 W. Va. 291, 124 S.E. 918 (1924) (party entitled to recission of contract on ground of fraud); *Big Huff Coal Co. v. Thomas*, 76 W. Va. 161 (1915); *Sams v. Barnes*, 74 W. Va. 420 (1914); *Home Gas Co. v. Mannington Co-op. Window Glass Co.*, 63 W. Va. 266 (1907).

Plaintiffs have alleged the Defendant suppressed the cost of the transaction *See* Sec. Am. Compl. ¶57. The range of factual issues involving the closing, and in particular, the suppression of

the terms from Gary, support the contract defense of fraudulent suppression. The suppression of the model year and misrepresentation of the cost of the unit are minor compared with the entire range of transaction terms suppressed in the closing process.

## IV. PLAINTIFFS' COUNT IV TRUTH IN LENDING INABILITY TO REPAY CLAIM INVOLVES AN EXTENSIVE FACTUAL PRESENTATION THAT CANNOT BE RESOLVED ON SUMMARY JUDGMENT

Plaintiffs' Count IV claim includes all of the substantive unconscionability issues, *e.g.,* unrealistic expense estimates, no residual income in fact, applying a clearly unaffordable rate and payment in a fully secured loan. It includes the procedural aspects of lack of meaningful inquiry into expenses, avoiding all interaction and involvement with Gary (the one who had firm handle on affordability), as well as use of electronic signature closing to facilitate suppression. Defendant devoted only one paragraph at the end arguing the merits of summary judgment on the claim (after seven on the burden of proof legal issue) demonstrating the difficulty of pursuing a summary determination on a totally factual issue without hearing evidence. The Claim is obviously inappropriate for summary judgment determination, given the Plaintiffs' prima facie case and factual issues for jury determination. VMF's residual income test makes unreasonable assumptions about basic living expenses, and the application process is structured in manner to avoid gathering of information about liabilities and expenses. This generated here an inaccurate and unreasonably high residual income calculation. The unnecessarily high rate loan secured by their previously lien-free home/land was clearly beyond the Casdorphs' affordability. *See* n.19*, supra*.

On the minor trial issue of which party has the burden of proof on the TIL claim, *i.e.* whether Defendant is entitled to a *rebuttable* presumption of a qualified mortgage, Defendant surveys accurately the applicable federal regulation but never gets to the legal issue involved here – the interpretation of Reg. Z, 12 CFR § 1026.43(e)(2)(vi)(B)&(D). The Plaintiffs submit that since

the loan is secured by real estate, it falls under subsection (B), which renders the loan well outside a loan entitling the lender to a rebuttable presumption. An illegal manufactured home lien does not move it into subsection (D) (A chattel mortgage only security would rationally have a higher threshold). Defendant's extensive discussion of the regulation details is not at issue.

## V. PLAINTIFFS' UNCONSCIONABLE DEBT COLLECTION CLAIM INVOLVES QUESTIONS OF FACT

Plaintiffs' Count V claim asserts that the conduct alleged in ¶¶ 37 and 38, Sec. Am. Compl., constituted an illegal debt collection practice (nothing in Count V references forced placed insurance). The conduct involves Defendant informing Plaintiffs before closing of a loan requirement of moving the current singlewide within ninety days of funding.[24] The Plaintiff describes in detail that before closing they were orally informed that they would have to move their preclosing mobile home by that date "90 days after funding" (*i.e*. 120 days after closing). It was not in the conditional approval (Def. Ex. 7; Dep. Lewelling 41:18-22). By the preclosing stages, to make the financing more affordable, Plaintiffs had decided to move it to the garden portion of their acreage and receive a $300 payment contribution from their daughter. Just after installation, the Plaintiffs were told *under threat of repossession that it had to be removed entirely from the property within two weeks.* They lost $300 toward the monthly payment and had to pay for costly removal, fearing loss of their real property. *See* Dep. Diana C. 169:17-171:24.

Not being an actual term of the loan, and especially with the change in timing, Plaintiffs allege that this oral demand under the threat of repossession was an unlawful debt collection practice in violation of WV Code §46A-2-128. Courts considering debt collection claims raised

24 The underwriter added this a stipulation because "we want the home on the property be the only home on the property . . . ." but this was not communicated at that time. *See* Dep. Lewelling, 48:7-10; & 44:13-47:24); it was not in the conditional approval (*id*. 41:18-22). Presumably, VMF wants easy disposition upon default without another residence on the real property.

under the WVCCPA have routinely held that threats to repossess or foreclose constitute debt collection.[25] This requires factual development.

## VI. THE LOAN IS UNENFORCEABLE AS TO GARY CASDORPH

Plaintiffs seek Partial Summary Judgment on Count VI that the loan is unenforceable as to Gary Casdorph because he did not sign the transaction documents, asserting no cause of action under any E-sign Act. *See* Pls. Memo. III.C. & esp. C.1. Defendant misses the point, and does not argue the applicable law. He did not sign.

The accurate *factual allegation* (not a statement of the claim) that because of his disability and requirements, Gary could not enter into an electronic agreement ("Vanderbilt pursued an E-sign agreement . . . without his having demonstrated compliance with statutory requirements.") The statement made in ¶ 72 of the Complaint is a factual allegation made to support the *legal claim* made in ¶ 73 that because Gary did not apply the electronic signature to the loan, his signature was forged and therefore the loan unenforceable. Hence the claim title: UNENFORCEABLE LOAN.

Defendant has presented no facts that show that Gary applied an electronic signature to the electronic documents. Although Defendant blithely states in its Response that passcodes were required to open the electronic documents, there is no evidence that requirement was applied in the Casdorphs closing. In order to enter passcodes to open a document, some electronic communication must have been established at a prior time to set up those passcodes. An audit trail tying the passcode to the individual whose signature appears must have been established prior to the actual signing. There is none in this case. Defendant's own expert goes through the entire

---

25 *See, e.g., Hanson v. Amerihome Mortg. Co., LLC*, 2017 U.S. Dist. LEXIS 212383, *13-14 (S.D.W. Va. Dec. 28, 2017) (collecting cases and affirming that actions surrounding foreclosure proceedings are attempts to collect debt) (citing *Ranson v. Bank of Am., N.A.,* 2013 U.S. Dist. LEXIS 35320 (S.D.W. Va. March 14, 2013)); *Lavis v. Reverse Mortg. Sols.,* LLC, 2017 U.S. LEXIS 89144, * 15-16 (finding consumer stated claims under the CCPA when mortgage company threatened retaking); *McGuire v. Jim Walter Homes, LLC,* 2014 U.S. LEXIS 146198, *19-20 (S.D.W. Va. Oct. 14, 2014) (holding that definition of debt collection includes collection activities including foreclosure).

electronic record and noticeably fails to show any evidence that the electronic documents were ever provided to Gary, that he opened the electronically delivered documents, and that he electronically signed them. *See* W. Va. Code § 39A-1-9(a) (electronic signature is attributable to a person only if it was "the act of the person," which may be shown by "the efficacy of any security procedure applied to determine the person to which the electronic . . . signature was attributable"); W. Va. Code § 39A-1-2(14) (defining "security procedure" as a procedure "employed for the purpose of verifying that an electronic signature, record or performance is that of a specific person"); W. Va. Code § 39A-1-10(1) (referring to a security procedure the parties "have agreed to use"); cf. W. Va. Code § 46-4A-201 (defining "security procedure" as "a procedure established by agreement" of the parties).[26]

Gary denies signing, the Defendant's expert never said Gary received the preclosing documents, never said Gary received the closing documents at any time, and never said that there was any evidence that it was Gary that applied the electronic signature to the closing documents. No one did. This Claim of Unenforceable Loan involves no dispute of fact.

## CONCLUSION

Whereupon, for the reasons more fully stated above, Plaintiffs respectfully request that Defendant's Motion for Summary Judgment be denied and the matter proceed to trial.

---

26 *Nat'l Inst. of Standards & Tech., Digital Identity Guidelines, Special Pub.* 800-63-4 (2025) (at enrollment, a subscriber account is established that uniquely identifies the individual and records the authenticators bound to that account; authentication then demonstrates control of authenticators bound to that identity); *Fannie Mae, Selling Guide* §§ A2-4.1-03, B8-8-02 (requiring evidence of the signer's authenticated identity and attribution of the signature to the purported signer, and retention of audit trails and identifying information used to verify attribution); *Bannister v. Marinidence Opco, LLC,* 64 Cal. App. 5th 541 (2021) (signature not attributable where proponent failed to show signer was assigned a unique, private username and password); *Ruiz v. Moss Bros. Auto Grp., Inc.*, 232 Cal. App. 4th 836 (2014) (same; proponent must explain how the electronic signature came to be placed on the document and that it could only have been placed by the signer).

**GARY W. CASDORPH and DIANA L. CASDORPH**
**By Counsel:**

*<u>/s/ Daniel F. Hedges</u>*
Daniel F. Hedges (WVSB # 1660)
Sarah K. Brown (WVSB # 10845)
MOUNTAIN STATE JUSTICE, INC.
1217 Quarrier St,
Charleston, WV 25301
Telephone: (304) 344-3144
Facsimile: (304) 344-3145
***COUNSEL FOR PLAINTIFFS***